30 A.3d 381

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Terry Ray CHAMBERLAIN, Appellant.**

Supreme Court of Pennsylvania.

Argued April 13, 2011.

Decided Oct. 14, 2011.

108

110

112

116

118

120

Heidi Fisher Eakin, Lemoyne, George H. Matangos, Harrisburg, Costopoulos, Foster & Fields, for Terry Ray Chamberlain.

John Scott Robinette, Towanda, William Ross Stoycos, Amy Zapp, Harrisburg, PA Office of Attorney General, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice BAER.

Appellant Terry Ray Chamberlain appeals from the sentence of death imposed on May 13, 1994, after a jury convicted him of two counts of first-degree murder, burglary, and possessing an instrument of crime. On direct appeal to this Court, we held that the trial court abused its discretion in denying a pretrial motion for continuance to allow Appellant to obtain DNA testing of certain blood evidence. *Commonwealth v. Chamberlain*, 557 Pa. 34, 731 A.2d 593 (1999) (*Chamberlain I* ). To remedy this abuse of discretion, we remanded the case to the trial court to afford Appellant the opportunity to conduct DNA tests. The trial court has completed the proceedings on remand, and we now consider the remaining claims of Appellant's direct appeal. For the reasons stated herein, we affirm the judgment of sentence.

We set forth the factual circumstances of this double murder in our prior opinion in Appellant's direct appeal, *Chamberlain I*. Briefly, Appellant's estranged wife Sherri Chamberlain and her boyfriend Greg Inman, with whom she lived, were found dead at their residence in the early morning hours of August 22, 1991. Each victim had been shot multiple times.

Sherri sustained five gunshot wounds, one of which was a shot to the chest that would have been fatal in a few minutes, and the last of which was an execution-style shot to the head that killed her instantly. Greg Inman had been shot four times, including one execution-style shot to the head.

The evidence demonstrated that the shooter gained entry by throwing a typewriter through a sliding glass door. An examination of the residence revealed multiple fired bullets and bullet fragments. There was blood throughout the living room and kitchen, where the victims were killed, including on the floors, walls, light switch, telephone, and sliding glass door. Additionally, blood was found on a washcloth and vanity surface in an upstairs bathroom. The state police collected blood evidence from the following locations in the victims' home (which will collectively be referred to as the blood evidence): the sliding glass door; the refrigerator door; the kitchen floor; the bathroom vanity; a light switch; the living room floor; the stairs; the railing along the stairs; and a living room wall.[1]

No forensic evidence linked Appellant to the murder, and police were unable to locate the murder weapon. The Commonwealth's sole direct evidence connecting Appellant to the murders was the testimony of Kim Ulrich. Mrs. Ulrich was Sherri's friend and neighbor. She testified that she was awakened by the telephone at 2:24 a.m. on August 22, 1991, and when she picked up the receiver the caller said "call an ambulance—Terry shot Greg and me." Mrs. Ulrich recognized the caller's voice as Sherri Chamberlain's. When Mrs. Ulrich asked "Sherri?" the caller failed to respond. Mrs. Ulrich explained that the telephone call lasted approximately 2.5 seconds, and she did not hear any background noise. She

1. The state police sent this blood evidence to a state police laboratory to be tested for blood type, and requested DNA testing as well. While the blood tests revealed that the blood was type O, which matched both of the victims and Appellant, the blood evidence was never subjected to DNA testing. In 1991, DNA testing was a new science and was not available at any state police laboratory. Although the FBI was capable of conducting DNA analysis, it did not do so in cases where a law enforcement agency's criminal investigators already possessed evidence of the perpetrator's identity. Trial Ct. Findings, Nov. 19, 2010, at 4.

further testified that she had spoken to Sherri on the telephone and face-to-face over 100 times within the last year and was certain the caller was Sherri. Mrs. Ulrich immediately told her husband about the telephone call. As Mrs. Ulrich called 911, Mr. Ulrich, a game warden, hurried to Sherri's and Greg Inman's residence, where he discovered the victims' bodies about five minutes after the telephone call. As he drove to the residence, which was 150 yards from his own home, Mr. Ulrich did not hear any gunshots or see anyone leaving the residence. According to his subsequent trial testimony, when he arrived at the home he could smell gunpowder in the air. He observed the telephone handset on the floor next to Sherri. Sometime after the state police and the coroner arrived at the scene to investigate, the coroner used the telephone that was next to Sherri's body, thus destroying any evidence that could have been obtained from the telephone's redial function, which, as explored later herein, became relevant to Appellant's defense. Police immediately apprehended Appellant at his home at 3:55 a.m., where they called him on the telephone, asked him to walk to the end of the driveway to surrender, and arrested him.

A criminal complaint was filed against Appellant alleging that he forcibly broke into the victims' home and murdered them by inflicting multiple gunshot wounds. On August 28, 1991, Appellant sought a dismissal of the complaint at a preliminary hearing because the Commonwealth failed to allege all of the essential elements of the crime; specifically, that the victims were human beings. Curiously, the district justice agreed with Appellant and dismissed the complaint. The Commonwealth immediately re-arrested Appellant. At a preliminary hearing held on September 6, 1991, the district justice granted Appellant's demurrer, finding that the Commonwealth failed to establish a *prima facie* case, and again dismissed the complaint.

The Commonwealth applied for the summoning of an investigative grand jury, and a grand jury was impaneled. On May 11, 1993, the Bradford County Investigating Grand Jury recommended that Appellant be charged with two counts of

criminal homicide and one count each of burglary, criminal trespass, and possessing instruments of crime. Accordingly, on May 19, 1993, another criminal complaint was issued against Appellant, premised on the same conduct alleged in the prior two complaints and containing statutory references to the specific crimes with which the grand jury recommended Appellant be charged. Appellant was promptly arrested for the third time.

On March 25, 1994, about a month before trial was scheduled to begin, the trial court conducted a pre-trial conference at which defense counsel learned for the first time that although the police had requested DNA analysis of the blood evidence, such analysis had never been conducted. Appellant requested a continuance in order to pursue independent DNA testing of the blood evidence, which he surmised would take about six weeks. *See* Trial Ct. Opinion, Oct. 7, 1996, at 45. The Commonwealth responded that any blood evidence that was sent to the lab for blood typing was probably destroyed. The trial court denied Appellant's request, concluding that there was adequate time for Appellant to conduct DNA testing before the start of trial. *Id.* (noting that trial was scheduled to begin April 25, 1994, actually commenced May 3, 1994, and that the defense did not present evidence until May 6, 1994, "precisely six weeks after the defense admittedly knew that it might want to have DNA testing performed"); Trial Ct. Findings, Nov. 19, 2010, at 5 ("The court refused the continuance, concluding that the six weeks requested to obtain DNA testing could be accommodated by the existing trial schedule."). At no time prior to trial, however, did the defense ask the trial court to order production of the blood evidence from the Commonwealth. *See* Trial Ct. Findings, Nov. 19, 2010, at 8, n. 1.[2]

---

2. Upon a review of Appellant's and the Commonwealth's 1997 briefs with this Court, it is apparent that although Appellant maintained that he requested the blood evidence pretrial, *see* Appellant's 1997 Brief at 54, the Commonwealth disputed this assertion, arguing that "Appellant did not pursue DNA testing following his discovery that the Commonwealth had not conducted DNA testing, despite the existence of adequate time to do so." Commonwealth's 1997 Brief at 46. In our 1999 opinion, we concluded that, based on the record before us, the defense

The case proceeded to trial. With regard to physical evidence in the victims' home, the Commonwealth presented evidence that each victim was shot and killed in a manner that suggested the shooter knew and bore ill will toward the victims. Additionally, the Commonwealth presented evidence that the killer fired multiple shots and then entered the bathroom to wash away blood, thus explaining how Sherri Chamberlain had the opportunity to place the telephone call to Mrs. Ulrich before the killer returned and delivered the fatal shots to her chest and head. The Commonwealth introduced ballistics evidence that a live round of ammunition found in the residence was from a .38 special Smith & Wesson and that all discharged shells and bullet fragments were fired from the same weapon. The Commonwealth did not introduce the blood evidence or rely on the results of the blood-type analysis.

Regarding the Commonwealth's evidence that Appellant was the murderer, the Commonwealth relied primarily on Kim Ulrich's testimony about the telephone call she received, and her husband's observations of the crime scene shortly thereafter. The Commonwealth also presented circumstantial evidence to corroborate the identification of Appellant as the killer. Specifically, the Commonwealth established that the murders occurred on the day before Sherri Chamberlain would have been eligible to obtain a no-fault divorce; her death on August 22, 1991, meant that all jointly owned property between Sherri and Appellant would be solely owned by Appellant. Further, Appellant's and Sherri's children were due to return to Sherri's physical custody for the school year. The Commonwealth also introduced evidence of Appellant's

"was never given an opportunity to conduct its own testing." *See Chamberlain*, 731 A.2d at 598. Upon remand in 2010, the trial court found that Appellant did not ask the court to order production of the blood evidence at any time prior to trial. Trial Ct. Findings, Nov. 19, 2010, at 8, n. 1. The record supports this finding; Appellant has not indicated anywhere in the record where he asked the Court to order production of the blood evidence before trial. Apparently, having been denied a continuance, Appellant chose not to pursue DNA testing. Thus, our discussion above reflects the trial court's finding in this regard.

malice and ill-will toward Sherri and Greg Inman, including filings in the couple's divorce proceedings and the testimony of a former co-worker, James Janowsky. Mr. Janowsky testified that he informed Appellant that he knew an individual who may have been willing to use violence to convince Sherri and Mr. Inman to terminate their relationship. Specifically, Mr. Janowsky explained that he had used this individual's services in the past in connection with his own marital dispute, and at that time, this person had been willing to "have somebody . . . put a pillow over . . . [Mr. Janowsky's] wife's head" or "slap her around a little bit." Trial Ct. Opinion, Oct. 7, 1996, at 8; N.T. May 3, 1994, Vol. XIII, at 188. Mr. Janowsky testified that Appellant wanted to meet this individual, but Mr. Janowsky declined to arrange the meeting.

Another of Appellant's co-workers, Stanley Mullen, testified that Appellant attempted to buy an unregistered handgun, specifically a .357 or .38 caliber, less than two months before the murders, ostensibly to shoot raccoons. Appellant was not interested in buying a properly registered handgun. The Commonwealth also introduced the recorded telephone conversation between Appellant and the state police trooper who called Appellant early in the morning of August 22, 1991, to direct him to surrender. During the conversation, Appellant expressed no surprise or curiosity, asked no questions about why the police were there, and was completely unemotional. According to police testimony, when Appellant exited the house his hair was damp and it was apparent that he was freshly bathed and cleaned.

The defense attempted to establish that Greg Inman's ex-wife, Sally Inman, had the motive, inclination, and opportunity to commit the murders, and was happy the murders were committed. It was Appellant's theory that Sally Inman committed the murders and then placed the telephone call to Mrs. Ulrich, pretending to be Sherri, from a payphone. In support thereof, two defense witnesses, who were the victims' neighbors, timed the shootings at 2:06 a.m., nearly twenty minutes before Mrs. Ulrich received the phone call. Sally Inman's son, who lived in Alaska, refuted this theory when he testified that

he had been on a telephone call with Sally Inman at the precise time of the murders.

A jury found Appellant guilty on May 12, 1994, of two counts of first-degree murder, burglary, and possessing an instrument of crime.[3] Finding two aggravating circumstances, but no mitigating circumstances, the jury sentenced him to death on May 13, 1994. *See* 42 Pa.C.S. § 9711(d)(6) ("The defendant committed a killing while in the perpetration of a felony") and (d)(11) ("The defendant has been convicted of another murder . . . committed either before or at the time of the offense at issue"). Appellant moved for a new trial grounded on a claim of after-discovered evidence and prosecutorial misconduct, for which hearings were concluded December 1, 1994. The trial court denied Appellant's motions for a new trial on May 2, 1995, and denied his motions for post-trial relief on October 7, 1996.

On direct appeal to this Court in 1997, Appellant raised sixteen issues, three of which this Court decided in *Chamberlain I.* First, we held that Kim Ulrich's testimony regarding the telephone conversation was admissible under two exceptions to the general prohibition of hearsay evidence, either as an excited utterance, 731 A.2d at 596, or a dying declaration, *id.* at 597. Second, we held that the participation of a deputy attorney general in the prosecution was appropriate. *Id.* at 599. The third issue, as will be discussed more fully *infra,* involved the blood evidence collected from the scene by the state police. We held that the trial court abused its discretion in denying Appellant's pretrial motion for a continuance to allow him to obtain DNA testing of the blood evidence. We explained that without subjecting this evidence to DNA testing, Appellant had been unable to advance his defense that someone else was the murderer. To remedy this abuse of discretion, we remanded the case to the trial court to afford Appellant the opportunity to conduct DNA tests, reasoning that the results of which "may form the basis for [A]ppellant to seek further post-trial relief in the trial court." *Id.* at 600.

3. 18 Pa.C.S. §§ 2502(a), 3502, and 907, respectively.

The trial court has completed the proceedings on remand, and the case is now before us to resolve the outstanding issues in Appellant's direct appeal.

## I. Sufficiency of the Evidence

In all capital cases this Court is required to conduct an independent review of the sufficiency of the evidence supporting a first-degree murder conviction. *Commonwealth v. King,* 554 Pa. 331, 721 A.2d 763, 770 (1998); *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). In conducting this review, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the Commonwealth as the verdict winner and determine whether the jury could have found every element of the crime beyond a reasonable doubt. *King,* 721 A.2d at 770; *Commonwealth v. Michael,* 544 Pa. 105, 674 A.2d 1044, 1047 (1996). To prove first-degree murder, the Commonwealth must demonstrate that the defendant acted with malice and a specific intent to kill, that a human being was unlawfully killed, that the defendant committed the killing, and that the killing was intentional, deliberate and premeditated. 18 Pa. C.S. § 2502; *Commonwealth v. Houser,* 18 A.3d 1128, 1133 (Pa.2011); *King,* 721 A.2d at 770; *Commonwealth v. Mitchell,* 528 Pa. 546, 599 A.2d 624, 626 (1991). Specific intent to kill can be inferred by the use of a deadly weapon upon a vital part of the body. *Commonwealth v. Speight,* 544 Pa. 451, 677 A.2d 317, 321 (1996). Malice, as well, may be inferred from the use of a deadly weapon upon a vital part of the victim's body. *Houser,* 18 A.3d at 1134 (citations omitted). Circumstantial evidence can itself be sufficient to prove any element or all of the elements of criminal homicide. *King,* 721 A.2d at 770; *Commonwealth v. Cox,* 546 Pa. 515, 686 A.2d 1279, 1285 (1996), *cert. denied,* 522 U.S. 999, 118 S.Ct. 567, 139 L.Ed.2d 407 (1997).

Appellant concedes that Sherri Chamberlain and Greg Inman were unlawfully killed and that the killing was intentional, deliberate, and premeditated. Appellant argues, however,

that the Commonwealth's evidence failed to establish that he was the murderer. In this regard, Appellant argues that the only direct evidence against him was Mrs. Ulrich's testimony about receiving a telephone call from Sherri. According to Appellant, this evidence was insufficient because the record did not demonstrate that Sherri placed the telephone call to Mrs. Ulrich, and, if she did, there was no evidence that he was the "Terry" to whom she referred. Moreover, Appellant claims that the evidence does not explain how Sherri was able to make the telephone call after being fatally shot in the chest and head, and if she made the telephone call before being fatally shot, then, according to Appellant, Mr. Ulrich would have heard gunshots or observed the killer fleeing as he approached the victims' house. Appellant views Mr. Ulrich's testimony that he did not hear any gunshots or see anyone leaving the victims' residence as consistent with the defense witnesses who testified that the shooting occurred closer to 2:06 a.m., thus suggesting that the killer had ample time to flee to a nearby payphone to place the call to Mrs. Ulrich at 2:24 a.m. Referring to the Commonwealth's evidence about motive, Appellant's appearance and demeanor when he was arrested, his attempt to buy an unregistered firearm, and his attempt to arrange a meeting with his co-worker's acquaintance, Appellant argues that this evidence did not demonstrate beyond a reasonable doubt that he is guilty.

Reviewing the evidence in the light most favorable to the Commonwealth, there is no question that the cause of Sherri Chamberlain's and Greg Inman's death was multiple gunshot wounds, which demonstrated that the shooter acted with the requisite malice and specific intent to kill, and committed the killings in an intentional, deliberate and premeditated manner. See 18 Pa.C.S. § 2502(d); Commonwealth v. Reed, 605 Pa. 431, 990 A.2d 1158, 1162 (2010); Speight, 677 A.2d at 321.

■ Moreover, the evidence was also sufficient to establish that Appellant was the perpetrator of these crimes. If the testimony of Kim Ulrich is believed, as we must presume pursuant to the sufficiency standard, there is no reasonable doubt Appellant is guilty. Mrs. Ulrich testified that on the

night of the murders, she received a telephone call from her friend and neighbor, Sherri, who told her to call an ambulance because "Terry" had shot "Greg and me." Mrs. Ulrich was familiar with Sherri's voice, having talked to her by telephone and face-to-face many times, and was absolutely certain the caller was Sherri; she never waivered in her identification of Sherri as the caller. Their conversations in the past had often centered on Sherri's divorce from Appellant; the only "Terry" the two discussed was Appellant.

As Mr. Ulrich entered the victims' home minutes later, he smelled the odor of gunpowder still in the air, and observed the telephone handset beside Sherri's lifeless body. Medical evidence presented at trial established that Sherri faced her killer when she suffered at least three of the bullet wounds. The Commonwealth proposed that after shooting the victims several times, the shooter attempted to cleanse himself of the victims' blood in the bathroom, giving Sherri an opportunity to place the telephone call, before the shooter returned to deliver the fatal shots to her chest and head. Standing alone, Mrs. Ulrich's testimony about the telephone call was sufficient to prove Appellant guilty beyond a reasonable doubt.

The Commonwealth, however, also presented significant circumstantial evidence tending to corroborate the identification of Appellant as the shooter. There was evidence that the murders were committed the day before Appellant's divorce was to be finalized; Appellant harbored ill-will toward Sherri and Greg Inman; and Appellant attempted to purchase an unlicensed firearm of the same caliber as the murder weapon, which was never recovered. At the time of his arrest, Appellant appeared calm, and expressed no curiosity or surprise at being called by the police at 4:00 a.m. and directed to exit his house with his hands visible. Police observed that his hair was still damp from being freshly cleaned. As the trial court observed, the jury could detect in Appellant's recorded voice during the telephone call from police immediately before his arrest the "expectancy, apprehension, and resignation of one whose otherwise flawless scheme to commit murder was undone by his underestimation of the will of one of his victims to

live, to seek desperately for help, and to identify her attacker." Trial Ct. Opinion, Oct. 7, 1996, at 11–12. Thus, we conclude that the evidence in this case was sufficient to support Appellant's first-degree murder convictions.

## II. Weight of the Evidence

Appellant challenges the verdict as being against the weight of the evidence and makes the same arguments offered in connection with his sufficiency challenge. Specifically, Appellant asserts that Mrs. Ulrich's testimony should be afforded little weight because she was asleep when she received the telephone call; Mr. Ulrich did not hear any shots after the telephone call, thus undermining the Commonwealth's theory that Sherri was shot in the chest and head after she placed the call; two defense witnesses testified that they heard shots fired twelve to twenty minutes before Mrs. Ulrich received the telephone call; the shot to Sherri's head killed her instantly, leaving no time to place a telephone call after the last shot; the shot to Sherri's chest would have caused her to lose consciousness in a matter of minutes; the Commonwealth destroyed the redial function on Sherri's telephone and was unable to corroborate Mrs. Ulrich's testimony; there was no direct evidence that Appellant was the perpetrator; and Mrs. Ulrich heard no background noise, the caller did not answer Mrs. Ulrich's queries of "Sherri?", and the call lasted just 2.5 seconds.

Additionally, Appellant argues that the killer cleverly framed him by committing the murders on the date Sherri would have been eligible for a no-fault divorce; Mr. Janowsky's testimony about Appellant's interest in meeting Mr. Janowsky's acquaintance was irrelevant; Mr. Mullen's testimony about Appellant's attempts to acquire an unlicensed firearm was inconsistent with earlier statements he had made and he had a motive to lie; Appellant's emotional state at receiving the telephone call from the police ordering him out of his house is consistent with him being in a state of shock and having showered before bed; and there was no evidence regarding the sequence of the gunshots to substantiate the

Commonwealth's suggestion that the fatal shots to Sherri's chest and head came after she placed the telephone call to Mrs. Ulrich. Based on these asserted weaknesses in the Commonwealth's case, Appellant argues that this Court should grant a new trial in the interest of justice.

The Commonwealth argues, to the contrary, that the verdict does not shock one's sense of justice, relying on the central evidence of Mrs. Ulrich's testimony and the evidence corroborating her testimony. According to the Commonwealth, Appellant's argument disregards the applicable standard of review of a trial court's resolution of a claim that a verdict is against the weight of the evidence. *Commonwealth v. Brown*, 538 Pa. 410, 648 A.2d 1177, 1191 (1994); *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545, 550 (1976) ("While there may be some legitimacy for a trial court, who [sic] has also observed the witnesses as they testified, to consider the weight of the evidence and to that extent review the jury's determination of credibility, there is surely no justification for an appellate court, relying upon a cold record, to exercise such a function.")

The trial court found no basis to grant Appellant a new trial on his weight of the evidence claim. Relying on Mrs. Ulrich's testimony about Sherri Chamberlain's telephone call, the trial court reasoned that the jury could have chosen to give as much weight to Sherri's dying declaration as it could have if she had appeared in court and identified Appellant as her attacker. The trial court further considered the Commonwealth's evidence in relation to the defense's evidence, and concluded that the jury could have found that the evidence from the defense was not of greater weight than that of the Commonwealth.

The decision of whether to grant a new trial on the basis of a challenge to the weight of the evidence is necessarily committed to the sound discretion of the trial court due to the court's observation of the witnesses and the evidence. *Brown*, 648 A.2d 1177. A trial court should award a new trial on this ground only when the verdict is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Whitney*,

511 Pa. 232, 512 A.2d 1152 (1986). A motion alleging the verdict was against the weight of the evidence should not be granted where it merely identifies contradictory evidence presented by the Commonwealth and the defendant. *Brown,* 648 A.2d at 1191. Our review on appeal is limited to determining whether the trial court abused its discretion in denying the motion for a new trial on this ground. *Id.* at 1190–91.

Here, in denying Appellant's motion for a new trial on this weight of the evidence claim, the trial court thoroughly reviewed the record and considered Sherri's identification of Appellant, introduced through the testimony of Mrs. Ulrich, as powerful evidence against Appellant, as was the circumstantial evidence of Appellant's motive, malice, attempt to buy an unregistered gun of the same caliber used to kill the victims, and calm demeanor at the time of arrest. The trial court further considered that the defense's evidence, in contrast, was largely limited to attempting to show that the victims were shot about twenty minutes before Mrs. Ulrich received the telephone call, and that Greg Inman's ex-wife had a motive to commit the murders. According to the trial court, the defense testimony about the timing of the shooting was internally inconsistent, came from witnesses whose observations at the time were not free from doubt, and did not have the corroboration which accompanied Mrs. Ulrich's testimony. Specifically, Mr. Ulrich arrived at the scene shortly after the telephone call and smelled fresh gunpowder, indicating that the shootings had very recently occurred. The trial court persuasively reasoned that it was not, therefore, manifestly unreasonable for the jury to accept Mrs. Ulrich's testimony instead of the defense evidence. Regarding the suggestion that Sally Inman committed the murders, counsel acknowledged that there was no testimony on the record that Ms. Inman was anywhere other than at her residence when the shooting occurred, and Ms. Inman's son testified that he was on a long-distance telephone call with Ms. Inman from Alaska at the time. Therefore, the jury could have found that the Commonwealth's evidence was weightier than the defense evidence. Accordingly, we cannot conclude that the trial court

abused its discretion when it held that the verdict did not shock one's sense of justice, and Appellant's claim fails.

### III. Blood Evidence

The next issue we turn to involves the aforementioned blood evidence. In *Chamberlain I,* we remanded this case to the trial court to afford Appellant the opportunity to conduct DNA testing of the blood evidence. On remand, the trial court directed the Commonwealth to provide Appellant with all mandatory and discretionary discovery pursuant to Rule 305(b) of the Pennsylvania Rules of Criminal Procedure. Pa. R.Crim.P. 305(b) (describing mandatory and discretionary disclosure by the Commonwealth).[4] The Commonwealth complied. Thereafter, the parties attempted over the next four years to identify what physical evidence Appellant desired to subject to DNA analysis. During the course of these efforts, the Commonwealth informed Appellant on July 9, 2001, that it did not have possession, custody, or control of the blood evidence that defense counsel referenced pre-trial. Trial Ct. Findings, Nov. 19, 2010, at 1.

Thereafter, Appellant sought and obtained numerous items of physical evidence in the Commonwealth's control to determine whether to subject the evidence to DNA testing. As of March 17, 2005, however, Appellant had not identified any evidence he wished to subject to such testing. Although the trial court directed Appellant to identify any items he desired to test, Appellant failed to comply. On July 10, 2006, the trial court entered an order stating that Appellant had failed to pursue diligently DNA testing following remand, and had therefore waived all claims regarding DNA testing or the lack thereof.

Although Appellant did not appeal this order, jurisdiction automatically returned to this Court pursuant to Pa.R.A.P. 1941 ("Review of Death Sentences"). The Commonwealth moved for a remand to the trial court for an evidentiary hearing and factual findings regarding the status of the blood

4. Former Pa.R.Crim.P. 305 has been renumbered as Pa.R.Crim.P. 573.

evidence and the circumstances surrounding the Commonwealth's handling of this evidence. On February 8, 2010, this Court granted the Commonwealth's motion, and remanded to the trial court with instructions to hold a hearing and make specific factual findings regarding whether the Commonwealth had possession, custody, or control of the blood evidence that Appellant requested pre-trial; the circumstances of the Commonwealth's handling of such evidence; the Commonwealth's efforts to locate the blood evidence following remand; and whether the Commonwealth engaged in bad faith in connection with its handling of the blood evidence. *Commonwealth v. Chamberlain*, 586 CAP (filed February 9, 2010) (*per curiam*).

The trial court complied, holding an evidentiary hearing and making numerous factual findings. Among other findings, the trial court detailed the blood evidence's chain of custody. It concluded that after the police sent the blood evidence to the state police laboratory for blood-type testing, which was performed December 31, 1991, the blood was returned to state police custody. Thereafter, boxes of evidence, which may or may not have included the blood evidence, were moved around numerous times before and after trial, and were not subjected to proper safekeeping. The trial court found that "the most likely" explanation for the disappearance of the blood evidence is that the District Attorney's Office personnel inadvertently placed an envelope containing the blood evidence into a file or with evidence for another, unidentified case, and that the file or evidence was relocated or destroyed in good faith. Trial Ct. Findings, Nov. 19, 2010, at 18.

The trial court further found that the Commonwealth does not have the blood evidence and that it informed Appellant of this fact on July 9, 2001; the Commonwealth made serious efforts to locate the evidence following remand; there is nothing to indicate that the blood evidence was exculpatory; and although the Commonwealth negligently handled the blood evidence by not subjecting it to proper safekeeping, the Commonwealth acted in good faith. The trial court also found that the Commonwealth believed that the blood evidence

originated from the victims, and it therefore had no motive to avoid DNA testing thereof. Moreover, according to the trial court, the prosecutors believed that Appellant's objective in asking for a continuance was not to obtain DNA testing, but to complain about the lack of DNA testing, a belief the trial court explained was born out by Appellant's failure to request that the trial court direct production of the blood evidence pre-trial.

Completely disregarding several of the trial court's factual findings, Appellant advances three alternative arguments with respect to the missing blood evidence, the first two of which are premised on the federal constitution and the third of which is premised on the state constitution: first, that under the federal constitution due process clause he is entitled to relief because the Commonwealth lost evidence that was material and possibly exculpatory, irrespective of bad faith; second, that under the federal constitution due process clause he is entitled to relief because the Commonwealth lost evidence that was potentially useful and acted in bad faith; and third, that under the state constitution he is entitled to relief because the missing blood evidence was central to the Commonwealth's case. As a remedy, Appellant requests that we overturn his conviction and bar retrial. These arguments are developed below.

Appellant's first argument characterizes the blood evidence as material and "possibly exculpatory." He claims an entitlement to relief based on the Commonwealth's failure to turn over this evidence irrespective of the Commonwealth's bad faith. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that a due process violation occurs when the state suppresses or fails to disclose material exculpatory evidence). Recognizing that the success of this argument depends on whether the blood evidence can be characterized as material and exculpatory, Appellant argues that this Court has already decided that the blood evidence was material in *Chamberlain I* when we explained that the defense reasonably argued that DNA testing might reveal the presence of another individual at the scene and remanded. He further asserts

that the evidence is "possibly exculpatory," suggesting an entitlement to relief premised on a lower standard than that articulated in *Brady*.

In the alternative, Appellant makes a second argument premised on the federal due process clause which characterizes the missing blood evidence as potentially useful and asserts that the Commonwealth acted in bad faith with respect to its handling of that evidence, thus constituting a federal due process violation. *See Illinois v. Fisher*, 540 U.S. 544, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004) (holding that the failure to preserve potentially useful evidence violates due process only if a criminal defendant can show bad faith on the part of the police); *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (same); *Commonwealth v. Snyder*, 599 Pa. 656, 963 A.2d 396 (2009) (holding that bad faith is required for a due process violation where merely potentially useful evidence is destroyed before the defense has an opportunity to examine it, regardless of whether the evidence is introduced at trial or how useful it is to the prosecution).

Appellant's argument in this respect is premised on a misrepresentation of the record. Although the trial court explicitly found that the Commonwealth did not engage in bad faith with regard to its negligent handling of the blood evidence, Appellant argues that, to the contrary, the Commonwealth's mishandling of the blood evidence was so grossly negligent that it actually amounted to bad faith. Specifically, Appellant submits that a close examination of the evidentiary record demonstrates that the Commonwealth knew before trial that the blood evidence was material and controversial, and that its cavalier mishandling of the evidence suggests that the evidence was intentionally lost or destroyed. Appellant highlights testimony from the hearing on remand indicating that prosecutors did not refrigerate the blood evidence, did not review the inventory of boxes of evidence received from the state police, and undertook no specific measures to safeguard or preserve the evidence. Although several Commonwealth witnesses testified that they believed the blood on the evidence belonged to the victims, Appellant argues that these

lay opinions are irrelevant and contrary to our prior suggestion in *Chamberlain I* that "the defense reasonably argued that DNA testing might reveal that someone other than appellant was at the scene and committed the murders." 731 A.2d at 597–98. Appellant suggests that because the perpetrator gained entry by throwing a heavy object through the glass door, this individual may have sustained an injury and bled throughout the house.

As further evidence of this alleged bad faith, Appellant argues that the Commonwealth failed to admit that the blood evidence was missing until July 2010. Additionally, Appellant asserts that the trial court's finding of no bad faith is a conclusion of law that the trial court was not empowered to make. He offers no support for this assertion. Appellant also argues that the Commonwealth purposefully lost, misplaced, or destroyed the blood evidence specifically to preclude Appellant from subjecting it to DNA analysis.

Appellant's third argument is premised on the state due process clause, *see* Article I, Section 9 of the Pennsylvania Constitution, which he argues affords greater constitutional protections than the federal due process clause concerning physical evidence in a criminal case. Although the Commonwealth did not introduce the blood evidence at trial, Appellant asserts that under state due process analysis he is entitled to relief because the missing blood evidence was central to the Commonwealth's case. *See Commonwealth v. Deans,* 530 Pa. 514, 610 A.2d 32, 34 (1992) (finding a federal due process violation resulting from evidence that was lost before the defense had an opportunity to examine it, based in part on our observation that the missing evidence was "the primary evidence in the case.") (abrogated by *Snyder,* 963 A.2d 396).[5] According to Appellant, the blood evidence was central to the Commonwealth's case even though it was not introduced at trial because this Court recognized its importance in *Chamberlain I* when we explained that defense counsel reasonably argued that DNA testing might reveal that someone other

5. See page 23 *infra* for a detailed discussion of the interplay between federal and state due process clauses apropos of this case claim.

than Appellant was at the scene. 731 A.2d at 598. Appellant urges this Court to consider the centrality of the evidence and to disregard the Commonwealth's lack of bad faith for purposes of the state due process analysis.

In support of his state due process argument, Appellant has developed an independent analysis of the state constitution as required by this Court in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887, 894 (1991) (directing litigants to consider four factors in undertaking a Pennsylvania constitutional analysis: 1) text of the Pennsylvania constitutional provision; 2) history of the provision, including Pennsylvania case-law; 3) related case-law from other states; and 4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence). The result of this analysis, he urges, is that the state due process clause requires consideration of the centrality of the missing evidence to the Commonwealth's case. According to Appellant, considering the centrality of the blood evidence irrespective of bad faith would entitle him to relief under state law even if he is not entitled to relief under federal law.

The Commonwealth responds that Appellant's three arguments rest on numerous factual and legal misrepresentations, and argues that all of the trial court's factual findings are supported by the record and entitled to deference. *See Snyder*, 963 A.2d at 406 (we are bound by a trial court's finding that the Commonwealth did not act in bad faith if the finding is supported by the record); *Commonwealth v. Myers*, 554 Pa. 569, 722 A.2d 649, 651–52 (1998) (questions of credibility and conflicts in the evidence are for the trial court to resolve, not the appellate courts). The Commonwealth specifically relies on the trial court's findings that although the Commonwealth was negligent, it did not act in bad faith with respect to the blood evidence; it made serious, comprehensive efforts to locate the blood evidence; and there is nothing in the record that indicates the blood evidence was exculpatory.

The Commonwealth argues that Appellant's first federal due process argument ignores the trial court's finding that nothing in the record indicates the blood evidence was excul-

patory. The Commonwealth further observes that Appellant's assertion that the blood evidence was "possibly exculpatory" appears to be an acknowledgement that he cannot demonstrate the truly exculpatory nature of the evidence. Turning to Appellant's second federal due process argument, the Commonwealth argues that it is premised on the incorrect assertion that the Commonwealth acted in bad faith, and the argument therefore lacks merit.

Regarding Appellant's third alternative argument, which is premised on the state constitution, the Commonwealth argues that Appellant offers nothing to support his assertion that state due process protections are intended to be broader than those guaranteed under the federal constitution. Additionally, the Commonwealth argues that even if this Court were to accept the premise that the state constitution provides greater constitutional protections than the federal due process clause, Appellant is not entitled to any relief under the standard he proposes because the blood evidence was not introduced at trial and therefore cannot be considered central to the Commonwealth's case.

 Preliminarily, we agree with the Commonwealth that a number of Appellant's assertions are premised on a misreading of the record and a disregard for the fact-finding function of the trial court. The trial court's factual findings that are supported by the record are binding on this Court. *Snyder*, 963 A.2d at 406; *Myers*, 722 A.2d at 651–52 (citing *Commonwealth of Pennsylvania, Dept. of Transp., Bureau of Traffic Safety v. O'Connell*, 521 Pa. 242, 555 A.2d 873, 875 (1989) and explaining that "[a]s long as sufficient evidence exists in the record which is adequate to support the finding found by the trial court, as factfinder, we are precluded from overturning that finding and must affirm . . . .").

 The trial court specifically found that the Commonwealth did not act in bad faith, that Appellant knew the blood evidence was missing as early as July 9, 2001, and there is no indication anywhere in the record that the blood evidence was exculpatory. A careful examination demonstrates that these

findings are supported by the record. Moreover, the judge who presided over the evidentiary hearing in July 2010 is the same judge who presided over Appellant's capital trial and the years of post-trial discovery. He was intimately familiar with these proceedings and the record, and engaged in a thorough analysis of the questions this Court directed him to consider in our remand order of February 9, 2010.

In that order, we recognized the factual aspects of the inquiry and specifically tasked the trial court with examining, among other factual questions, "whether the Commonwealth engaged in bad faith in connection with its handling of the blood evidence." Despite the existence of an exhaustive record and an evidentiary hearing devoted to whether the Commonwealth acted in bad faith, Appellant has failed to reference any evidence that supports his allegation of bad faith. Rather, as the trial court aptly noted, any claim of bad faith is a supposition arising from nothing more than the absence of the blood evidence. Trial Ct. Findings, Nov. 19, 2010, at 16. Moreover, Appellant has offered nothing to refute the trial court's finding that Appellant knew the blood evidence was missing as of July 9, 2001, and has likewise offered nothing more than his opinion and speculation that the blood evidence was exculpatory. Therefore, Appellant's alternative reading of the record is unsupported. Because the trial court's factual findings are supported by the record, we must defer to them. *See Snyder*, 963 A.2d at 406; *Myers*, 722 A.2d at 651–52.

Turning to Appellant's two federal due process arguments, the Due Process Clause of the Fourteenth Amendment requires defendants be provided access to certain kinds of evidence prior to trial, so they may "be afforded a meaningful opportunity to present a complete defense." *Snyder*, 963 A.2d at 401 (quoting *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). This guarantee of access to evidence requires the prosecution to turn over, if requested, any evidence which is exculpatory and material to guilt or punishment, *see Brady*, 373 U.S. 83, 83 S.Ct. 1194, and to turn over exculpatory evidence which might raise a reasonable doubt about a defendant's guilt, even if the defense fails

to request it, *see United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). *Snyder,* 963 A.2d at 401. If a defendant asserts a *Brady* or *Agurs* violation, he is not required to show bad faith. *Id.* at 401, n. 6.

 There is another category of constitutionally guaranteed access to evidence, which involves evidence that is not materially exculpatory, but is potentially useful, that is destroyed by the state before the defense has an opportunity to examine it. *Id.* at 401. When the state fails to preserve evidence that is "potentially useful," there is no federal due process violation "unless a criminal defendant can show bad faith on the part of the police." *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333; *see also Fisher,* 540 U.S. at 547, 124 S.Ct. 1200. Potentially useful evidence is that of which "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood,* 488 U.S. at 57, 109 S.Ct. 333; *Fisher,* 540 U.S. at 548, 124 S.Ct. 1200. In evaluating a claim that the Commonwealth's failure to preserve evidence violated a criminal defendant's federal due process rights, a court must first determine whether the missing evidence is materially exculpatory or potentially useful. *See Fisher,* 540 U.S. at 547, 124 S.Ct. 1200; *Snyder,* 963 A.2d at 405.

 Appellant appears to have developed his argument in an attempt to fit alternatively within both categories to which defendants enjoy constitutionally guaranteed access: evidence that is exculpatory and material, and evidence that is potentially useful. His efforts, however, are fatally undermined by serious and obvious defects. Regarding his first due process argument, and considering whether the missing evidence is material and exculpatory, for which a due process violation occurs whenever such evidence is withheld, *see Brady,* 373 U.S. 83, 83 S.Ct. 1194; *Agurs,* 427 U.S. 97, 96 S.Ct. 2392 (1976), we have no difficulty concluding it is not. Not only are we bound by a specific factual finding that nothing in the record supports an inference that the blood evidence would tend to be exculpatory, *see* Trial Ct. Findings, Nov. 19,

2010, at 16, Appellant does not actually argue that the evidence was exculpatory. Rather, he asserts it was "possibly exculpatory," Appellant's 1997 Brief at 45. Evidence that is possibly exculpatory is only merely potentially useful, *see Youngblood*, 488 U.S. at 57, 109 S.Ct. 333, the loss of which, pursuant to *Fisher*, *Youngblood*, and *Snyder* as explained above, creates a constitutional deprivation only if the Commonwealth acted in bad faith.

Appellant's second due process argument, premised on his assertion that the blood evidence is potentially useful which, combined with the Commonwealth's alleged bad faith, entitles him to relief, is defeated by the fact that the Commonwealth did not act in bad faith. Trial Ct. Findings, Nov. 19, 2010, at 16. Although we agree that the missing blood evidence is potentially useful, because the most that can be said of it is that "it could have been subjected to tests, the results of which might have exonerated the defendant," *Fisher*, 540 U.S. at 547, 124 S.Ct. 1200 (citing *Youngblood*, 488 U.S. at 57, 109 S.Ct. 333), the right to relief resulting from the loss of such potentially useful evidence depends on whether the Commonwealth acted in bad faith. *Youngblood*, 488 U.S. at 57, 109 S.Ct. 333. Because it did not, Appellant is not entitled to relief from the loss of this potentially useful evidence.

Having concluded that Appellant is not entitled to relief under the federal constitution, we proceed to examine his entitlement to relief under the state constitution. For his state constitutional argument, Appellant relies on *Commonwealth v. Deans*, 530 Pa. 514, 610 A.2d 32 (1992), *overruled by Snyder*, 963 A.2d 396, in which we interpreted and applied the federal due process clause. Even though *Deans* was a federal due process case, which was subsequently overruled for purposes of federal due process analysis in *Snyder*, Appellant's argument is that we should breathe new life into *Deans* and establish its holding as premised on state constitutional law.

In *Deans*, we held that suppression was required where the Commonwealth sought to introduce expert testimony that a lottery ticket was forged, and the Commonwealth lost the

ticket after examining it but before the defense conducted an independent examination. Reaching this conclusion, we considered as a paramount factor that the missing lottery ticket was "the primary evidence in the case." 610 A.2d at 34. Our examination of the centrality of the evidence in *Deans* pursuant to our analysis of federal due process law, however, was inconsistent with the subsequent federal decisions of *Youngblood* and *Fisher*. In *Snyder* we recognized that our analysis of the federal due process clause in *Deans* was no longer good law because of the subsequent cases and therefore abrogated it. In a concurring opinion, this author opined that the *Deans* construct analyzing the centrality of the evidence to the Commonwealth's case remains a preferable criteria to employ in determining whether there is a due process violation. *Snyder*, 963 A.2d at 409 (Baer, J., concurring). The concurrence agreed with the majority, however, that as a matter of federal due process, the analysis turns on whether the evidence is materially exculpatory or potentially useful. *Id.* The concurrence also observed that this Court could, in another case where the issue is properly presented, consider the centrality of the evidence as a factor in analyzing the state due process clause; and invited litigants to develop this argument in future cases. *Id.*

Appellant has purported to accept the invitation of the concurring opinion in *Snyder* and argues first that we may interpret our state due process clause to provide more protection than its federal counterpart and second, that pursuant to state law, we should consider the centrality of the evidence to the Commonwealth's case. While we agree that we may interpret provisions of the Pennsylvania Constitution to provide greater protection than their federal counterparts, *see, e.g., Edmunds*, 586 A.2d 887, we decline to entertain such an interpretation here because Appellant's claim fails under the interpretation he has offered. Appellant specifically requests that we consider the centrality of the blood evidence in deciding his state due process claim. The blood evidence, however, was not introduced at Appellant's trial, and cannot, by any stretch of the imagination, be considered "the primary

evidence in the case." *Deans,* 610 A.2d at 35–36. Therefore, even if we were to consider the centrality of the evidence in this case as Appellant requests, he could not prevail.

Finally, we cannot conclude our analysis of the Commonwealth's loss of the blood evidence without offering an additional observation. To the extent Appellant argues that our prior discussion of the blood evidence in *Chamberlain I* has somehow established his entitlement to due process relief, he is mistaken. In *Chamberlain I,* the Court assumed the blood evidence existed, and that the trial court abused its discretion in denying a continuance to afford Appellant the opportunity to test it. Now it is clear that the blood evidence is not available for testing. We have set forth the proper analysis of missing evidence above, which is not inconsistent with or dependent on our prior analysis in *Chamberlain I,* and which does not offer Appellant the opportunity for relief without demonstrating he is entitled to it in accord with governing law.

We conclude, therefore, that Appellant is not entitled to any relief on his due process claims resulting from the missing blood evidence.

## IV. Redial Function

Appellant's next issue is similar to his claim of a due process violation resulting from the Commonwealth's loss of the blood evidence. In this issue, Appellant claims a due process violation resulting from the coroner's use of Sherri Chamberlain's telephone at the crime scene, which destroyed any evidence that could have been obtained from the telephone's redial function.[6] Appellant claims that the lost evidence may have been exculpatory if, in fact, no call to Mrs. Ulrich had been placed from Sherri's telephone, and that it may have been destroyed in bad faith. Alternatively, apparently recognizing that he cannot demonstrate the exculpatory nature of the redial function or the Commonwealth's bad faith, as required

6. At the time, apparently, only the last number dialed on the phone could be obtained through the redial function; thus, the number of the call placed by Sherri would have been removed and replaced with the number dialed by the coroner. For simplicity, this missing evidence is referred to as the "redial function."

pursuant to federal due process law, *see Youngblood,* 488 U.S. 51, 109 S.Ct. 333 (1988); *Trombetta,* 467 U.S. 479, 104 S.Ct. 2528 (1984), Appellant urges this Court to grant relief under the state due process clause and our holding in *Deans,* 610 A.2d 32.[7]

The Commonwealth argues that because Appellant has not and cannot establish that the redial function possessed exculpatory value that was apparent before the evidence was destroyed, as required by *Trombetta,* 467 U.S. at 489, 104 S.Ct. 2528, or that the Commonwealth acted in bad faith in regard to the loss of the redial function, as required by *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333, he has no basis for relief under the federal due process clause. With respect to his state due process claim, the Commonwealth argues first that Appellant did not raise a state due process claim with respect to the redial function before the trial court, and it is therefore waived. Second, even if we were to apply *Deans* pursuant to state due process law, the Commonwealth argues that Appellant is not entitled to relief because the redial function was not central to the Commonwealth's case; indeed, the Commonwealth did not introduce evidence derived from the telephone's redial function.

The trial court dismissed Appellant's federal due process claim because there was no indication that the redial function was exculpatory or that the Commonwealth acted in bad faith. *Trombetta,* 467 U.S. 479, 104 S.Ct. 2528; *Youngblood,* 488 U.S. 51, 109 S.Ct. 333. Moreover, because the Commonwealth did not seek to introduce evidence related to the redial function, the trial court reasoned that Appellant was not entitled to relief pursuant to our interpretation of the federal due process clause in *Deans,* 610 A.2d at 34.

Although we ultimately determine that Appellant is not entitled to relief under federal due process, we recognize that this case presents a facially difficult issue. The centerpiece of

7. Appellant has not provided any argument regarding whether the destruction of evidence by the coroner, who is not a police officer, should be treated in the same manner as the destruction of evidence by police. For purposes or our discussion, we will assume that it should.

the Commonwealth's case against Appellant was Mrs. Ulrich's testimony that she received the telephone call from the victim, and her husband's corroborating testimony that he observed the telephone handset next to Sherri's lifeless body. The only evidence that could have countered the Commonwealth's theory that the victim placed the telephone call to Mrs. Ulrich was destroyed by the coroner. Notwithstanding the facial appeal of Appellant's argument, under the well-established federal due process construct, he cannot prevail.

Appellant cannot meet his burden under the federal due process clause because he concedes, as he must, that he can demonstrate neither the exculpatory value of the redial function nor bad faith on the part of the Commonwealth. *See* Appellant's 1997 Brief at 49 (urging the Court not to require the missing evidence to be exculpatory or destroyed in bad faith, as required under federal law). Although he asserts that the evidence was exculpatory or destroyed in bad faith, he offers nothing to substantiate these assertions. *See* Appellant's 2011 Brief at 32 (claiming that the redial function is evidence "that the defense believes was exculpatory" and that the destruction of that evidence "may have been done in bad faith"). Appellant's assertions, with nothing more, are not sufficient to entitle him to federal due process relief. *See Trombetta*, 467 U.S. at 489, 104 S.Ct. 2528 (holding that the exculpatory nature of the missing evidence must be apparent); *Youngblood*, 488 U.S. at 58, 109 S.Ct. 333 (requiring a criminal defendant to show bad faith on the part of the police to warrant due process relief from the failure to preserve potentially useful evidence).

Turning to Appellant's entitlement to relief under the state due process clause, Appellant did not claim before the trial court that the Pennsylvania Constitution provided an independent basis for relief. His state due process claim, therefore, is waived. *Commonwealth v. Colavita*, 606 Pa. 1, 993 A.2d 874, 891 (2010) ("[C]ourts should not reach claims that were not raised below."); Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for

the first time on appeal."). Moreover, as explained above, this Court's focus on the centrality of the missing evidence to the Commonwealth's case in *Deans* was overruled by this Court in *Snyder*. Although one member of the Court expressed approval of this concept for purposes of state law in a concurring opinion, *see Snyder*, 963 A.2d at 409 (Baer, J., concurring), the Court has never held that the state due process clause differs from the federal due process clause in this respect. We decline to consider whether state due process should depart from federal due process with regard to missing evidence where this argument was not directly advanced in the court below. Although this is a troubling issue, we conclude that no relief is warranted.

## V. Commonwealth's Closing Argument

Next, Appellant challenges two aspects of the prosecutor's closing argument. First, Appellant contends that the prosecutor twice asserted his personal opinion about Appellant's guilt by referring to him as a "murderer" and therefore improperly prejudiced the jury. Second, Appellant claims the prosecutor's description of the sequence of shots was not supported by the evidence. The trial court overruled Appellant's objections to this portion of the prosecutor's closing argument and instructed the jury that arguments of counsel are not evidence.

With respect to the first of these two contentions, Appellant claims that the following portions of the closing argument were inflammatory and prejudiced the jury, thus precluding a fair verdict:

And when you deliberate and conclude that [Appellant is guilty], you will realize ... this is a matter of profound seriousness and your realization, at the conclusion of your deliberations, will be one that indicates the defendant's guilt, beyond any reasonable doubt, and will tell you something that is, in its way, an awesome thing. That is, for the time we have been here together, hearing this evidence, *we've been in the presence of a murderer.* A person who had that awesome willingness. It's an awesome thing to

take a deadly weapon and to fire shots into another human being, into two other human beings. It's an awesome terrible thing to separate the soul of a human being from their body and kill them.

N.T. May 11, 1994, Vol. XXIV, at 2–3 (emphasis added). At the end of the closing argument, the prosecutor argued as follows:

Say to him, when you will come back, through your foreperson, and then as I called upon you earlier, each and every one of you to rise, as is your duty, say to him that beyond any reasonable doubt, the law, when applied to the facts in this case, says to him what Sherri said that night. What his heart, violence and motive, horror and ability and willingness and awesome lack of concern for anybody by his own evil deed, say to him, say to him what I say now, that when you rise you will announce before God and this court and us that you, Terry Chamberlain, are guilty of taking human lives. You're guilty of murder. *You are a murderer.*

*Id.* at 55 (emphasis added).

Appellant argues that by twice referring to him as a murderer, the prosecutor made personal assertions of guilt and thereby prejudiced Appellant. *See Commonwealth v. Baker,* 531 Pa. 541, 614 A.2d 663, 671 (1992) ("statements to the jury are not improper unless their 'unavoidable effect' is to 'prejudice' the jury so that a true verdict cannot be rendered because the existence of bias and hostility makes it impossible to weigh the evidence in a neutral manner," citing *Commonwealth v. Carpenter,* 511 Pa. 429, 515 A.2d 531 (1986)). According to Appellant, at the time of the closing argument, he had not yet been adjudged guilty, and by referring to him as a murderer, the prosecutor attempted improperly to assume the role of fact-finder.

With respect to his second contention premised on the prosecutor's closing argument, Appellant argues that the prosecutor prejudiced him by focusing on the sequence of the shots fired by the murderer when the Commonwealth's own

expert, Dr. Isidore Mihalikis, could not determine the sequence of shots. The specific portion of the closing argument to which Appellant refers encompasses several pages. It is the prosecutor's summary of the evidence showing how the murderer gained entry, encountered Greg Inman asleep on the couch, and shot him three times, then rolled him over to face him. According to the prosecutor, as Sherri Chamberlain came downstairs, the shooter fired a shot at her that missed; as she fled, the shooter fired and missed again; the sixth shot fired was to Sherri's abdomen, causing her to bleed on her hands and onto the wall, door, light switch, refrigerator, stairs, and elsewhere; as the shooter reloaded, he dropped a live round on the floor; the next shot grazed Sherri's head; the shooter washed the blood off of himself in the bathroom while Sherri placed the telephone call to Mrs. Ulrich, then returned to shoot Sherri in the chest and head; and, finally, the shooter returned to Mr. Inman and shot him once more, in the head, before leaving. Appellant contends that because Dr. Mihalikis could not determine the sequence of shots, neither could the prosecutor, and that because of this argument the jury's verdict should be set aside.

Regarding the prosecutor's two references to Appellant as a murderer, the Commonwealth responds that a contextual review of the closing argument reveals that these references were not expressions of personal belief but were isolated features of legitimate argument based on the evidence. The Commonwealth argues that in each instance, the prosecutor merely suggested the conclusion the jury should reach based on the evidence. According to the Commonwealth, we have refused to award a new trial under similar circumstances. *See Commonwealth v. D'Amato*, 514 Pa. 471, 526 A.2d 300, 309 (1987) (declining to grant relief where the prosecutor described the defendant as a "clever, calculating and cunning executioner"); *Commonwealth v. Carpenter*, 511 Pa. 429, 515 A.2d 531, 536 (1986) (denying relief where the prosecutor referred to the defendant as a "murderer" who "took the stand and lied"); *Commonwealth v. Gordon*, 431 Pa. 512, 246 A.2d 325 (1968) (where the prosecutor referred to "those eyes

on that killer," we did not condone the reference, but declined to award relief). Additionally, the Commonwealth argues that there is no evidence that the prosecutor referred to Appellant as a murderer in an attempt to destroy the objectivity of the jury. *See Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367, 1378 (1991) (holding that the defendant was not entitled to a new trial because certain remarks made by the prosecutor "were not a deliberate attempt to destroy the objectivity of the fact finder, but merely summarized the evidence presented at trial with the oratorical flair permitted during argument.").

Turning to Appellant's second contention that there was no evidence to support the prosecutor's summation of the sequence of the shots fired, the Commonwealth observes that the complained of portion of the closing argument was based on the physical evidence at the crime scene and the inferences that fairly arose from the physical and medical evidence *in toto,* which was entirely proper. *See D'Amato,* 526 A.2d at 309 ("Counsels' remarks to the jury may contain fair deductions and legitimate inferences from the evidence presented during the testimony.").

It is well established that a prosecutor must have reasonable latitude in presenting a case to the jury, and must be free to present arguments with "logical force and vigor." *D'Amato,* 526 A.2d at 309 (citing *Commonwealth v. Smith,* 490 Pa. 380, 416 A.2d 986 (1980)); *Commonwealth v. Cronin,* 464 Pa. 138, 346 A.2d 59, 62 (1975). Counsel may comment upon "fair deductions and legitimate inferences from the evidence presented during the testimony." *D'Amato,* 526 A.2d at 309; *Commonwealth v. Fairbanks,* 453 Pa. 90, 306 A.2d 866 (1973). Although a prosecutor may argue to the jury that the evidence establishes the defendant's guilt, *D'Amato,* 526 A.2d at 309; *Commonwealth v. Capalla,* 322 Pa. 200, 185 A. 203 (1936), arguments from personal opinion as to the guilt of the accused are not proper. *D'Amato,* 526 A.2d at 309; *Commonwealth v. DiNicola,* 503 Pa. 90, 468 A.2d 1078 (1983); *Commonwealth v. Pfaff,* 477 Pa. 461, 384 A.2d 1179 (1978).

 Moreover, not every remark by the prosecutor, even assuming it is intemperate or uncalled for, requires a new trial. *D'Amato*, 526 A.2d at 309. A prosecutor's comments do not amount to reversible error unless the "unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." *Id.; Commonwealth v. Carpenter*, 511 Pa. 429, 515 A.2d 531 (1986); *Commonwealth v. D'Ambro*, 500 Pa. 303, 456 A.2d 140 (1983). Moreover, the prejudicial effect of the prosecutor's remarks must be evaluated in the context in which they occurred. *D'Amato*, 526 A.2d at 309; *Carpenter*, 515 A.2d at 531; *Smith*, 416 A.2d at 989. In applying these standards on appellate review, we have explained that whether this standard has been violated by the language of the prosecutor is not in the first instance an appellate court's decision to make; rather, it is the duty of the trial judge to rule upon the comments and we are limited to reviewing whether the trial court abused its discretion. *D'Amato*, 526 A.2d at 309; *Commonwealth v. Simon*, 432 Pa. 386, 248 A.2d 289, 292 (1968).

 Appellant's first assertions of prejudice, premised on the prosecutor's use of "murderer," fail when these portions of the argument are viewed in context. As the trial court explained, in each instance, the prosecutor did not merely label Appellant a murderer. Trial Ct. Opinion, Oct. 7, 1996, at 78. Rather, he argued that the evidence and the reasonable inferences therefrom led to the conclusion that Appellant was a murderer. *Id.* at 80. By asserting that the evidence led to the conclusion that Appellant was guilty, the prosecutor did not advocate his personal belief of Appellant's guilt. The prosecutor is free to argue that the evidence leads to the conclusion of guilt, and is permitted to suggest all favorable and reasonable inferences that arise from the evidence. *Commonwealth v. Sam*, 535 Pa. 350, 635 A.2d 603 (1993).

Appellant's second assertion of prejudice arising from the prosecutor's description of the sequence of shots and injuries, which Appellant argues was not supported by the record, likewise fails. Although Dr. Mihalikis testified that he was unable to determine the sequence of the injuries from his examination of the bodies, the prosecutor's theory of the events was not based on the testimony of Dr. Mihalikis. Instead, as the trial court observed, the prosecutor relied on the location and trajectory of the bullets, the position and condition of the bodies, the position of furniture and other physical evidence, and the location of blood throughout the house. Trial Ct. Opinion, Oct. 7, 1996, at 82–83. As a result of considering all of the evidence, the prosecutor was able to arrive at "a remarkably consistent and coherent theory which credibly explained an apparently random blaze of gunfire." Trial Ct. Opinion, Oct. 7, 1996, at 83. The prosecutor acted within his prerogative to draw "fair deductions and legitimate inferences from the evidence presented ..." *D'Amato,* 526 A.2d at 309. Where the prosecutor's arguments are supported by the evidence and contain inferences which are reasonably derived therefrom, no new trial is warranted. *Commonwealth v. Bronshtein,* 547 Pa. 460, 691 A.2d 907, 919 (1997); *Commonwealth v. LaCava,* 542 Pa. 160, 666 A.2d 221, 227 (1995); *Commonwealth v. Hardcastle,* 519 Pa. 236, 546 A.2d 1101, 1109 (1988).

Because we conclude that these instances of alleged prosecutorial misconduct in the closing argument did not individually nor in the aggregate prejudice Appellant, this claim fails.

## VI. *Brady*

Appellant's next claims are premised on *Brady,* 373 U.S. 83, 83 S.Ct. 1194, which held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment. . . ." To establish a violation of *Brady,* a defendant is required to demonstrate: (1) the evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and

(3) the evidence was material, in that its omission resulted in prejudice to the defendant. *Commonwealth v. Dennis*, 17 A.3d 297, 308 (Pa.2011); *Commonwealth v. Lambert*, 584 Pa. 461, 884 A.2d 848, 854 (2005).

 The burden rests with Appellant to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution." *Commonwealth v. Paddy*, 15 A.3d 431, 451 (Pa.2011); *Commonwealth v. Porter*, 556 Pa. 301, 728 A.2d 890, 898 (1999). There is no *Brady* violation when the appellant knew or, with reasonable diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from non-governmental sources. *Paddy*, 15 A.3d at 451; *Lambert*, 884 A.2d at 856. *Brady* does not require the disclosure of information "that is not exculpatory but might merely form the groundwork for possible arguments or defenses." *Paddy*, 15 A.3d at 450; *Lambert*, 884 A.2d at 856. Similarly, *Brady* does not require the prosecution to disclose "every fruitless lead" considered during the investigation of a crime. *Paddy*, 15 A.3d at 451; *Lambert*, 884 A.2d at 857.

 Evidence is material under *Brady,* and the failure to disclose it justifies setting aside a conviction, only where there exists a reasonable probability that had the evidence been disclosed the result at trial would have been different. *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Conversely, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not establish materiality in the constitutional sense." *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014, 1019 (2003) (quoting *Agurs*, 427 U.S. 97, 96 S.Ct. 2392). In determining whether a "reasonable probability" of a different outcome has been established, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Dennis,* 17 A.3d at 308 (quoting *Kyles,* 514 U.S. at

434, 115 S.Ct. 1555). Such a "reasonable probability" of a different result is established when the government's suppression of evidence "undermines confidence in the outcome of the trial." *Id.* (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375). In engaging in this analysis, a reviewing court is not to review the undisclosed evidence in isolation, but, rather, the omission is to be evaluated in the context of the entire record. *Commonwealth v. Small,* 559 Pa. 423, 741 A.2d 666, 675–76 (1999).

Appellant argues that the prosecution violated constitutional due process under *Brady* by withholding three pieces of evidence, all of which purportedly indicated that Sally Inman (Greg Inman's ex-wife) was the perpetrator of the crimes: (1) a statement from an individual named Patrick Beirne that Sally Inman told Emerson Hyde York, who then told Beirne, that she (Sally Inman) killed the victims; (2) statements allegedly made by Mr. and Mrs. Buonfiglio (who were acquainted with Sally Inman and the victim Greg Inman) that they overheard Sally Inman threaten to kill Greg Inman; (3) a statement allegedly provided by Gary Nichols (an acquaintance of Greg Inman) that he believed he witnessed a threatening incident involving Greg Inman. Following Appellant's motion to set aside the verdict or for a new trial grounded on this evidence, the trial court held hearings and rendered an opinion making specific findings on May 2, 1995. A summary of the testimony produced at these hearings follows.

Mr. Beirne testified that he had a conversation with Mr. York, in which Mr. York conveyed that Sally Inman had confessed (to Mr. York) that she had committed the murders and that she had access to several guns. Mr. Beirne testified that he relayed this information to First Assistant District Attorney Stephen G. Downs. Attorney Downs disputed this and testified that although he discussed Mr. York's belief in Sally Inman's guilt with Mr. Beirne, and obtained Mr. York's phone number, Mr. Beirne never said that Sally Inman had confessed to the murders. Rather, according to Attorney Downs, Mr. Beirne conveyed that Mr. York believed Ms. Inman committed the murders. Attorney Downs made several unsuccessful attempts to contact Mr. York at the telephone

number provided. The District Attorney's office determined that the information provided by Mr. Beirne was a fruitless lead, and the Commonwealth acknowledged that Mr. Beirne's name was not provided to Appellant in discovery. Additionally, the parties agreed that Mr. York's name appeared in a police report dated February 10, 1993, which was among the items delivered to the defense during discovery; this report contained the substance of an interview with Sally Inman and reported that Mr. York had told another individual that Ms. Inman had committed the murders and that this other individual believed Ms. Inman hired Mr. York to commit the murders.

Together, the Buonfiglios testified that on January 25, 1990, they heard Sally Inman tell Greg Inman that she wished he were dead and that she would like to kill him, and, two months before the murders, Greg Inman confided in them that he was afraid of Sally Inman. They testified that they informed the township police chief, Martin Rinebold, who came to their residence to discuss the matter, and that on Chief Rinebold's suggestion, they also contacted the state police. Chief Rinebold also testified, and flatly contradicted the Buonfiglios, as did a Corporal Robert Grimes, from the state police, who testified that the state police had no report of any contact made by the Buonfiglios.

Mr. Nichols testified that on the morning before the murders, he was conversing with Greg Inman at a gas station when a black mustang with tinted windows drove into the station and accelerated the engine. The incident lasted ten seconds, and Mr. Inman became quiet and did not respond when Mr. Nichols questioned the identify of the driver. After hearing about an award offered by state police for information about the murders, Mr. Nichols came forward with this story. Corporal Grimes agreed that he had been contacted by Mr. Nichols but testified that he made no report of the interview because the information had no investigative value.

Appellant now asserts that the Commonwealth suppressed information provided by Mr. Beirne, the Buonfiglios, and Mr. Nichols, and this information was exculpatory and material

because it indicated that Sally Inman may have committed the murders. Appellant argues that Mr. York's statement, as reported by Mr. Beirne, implicated Ms. Inman in the murders, and knowledge of this statement would have altered the defense's investigation. Similarly, Appellant argues that the statements provided by the Buonfiglios and Mr. Nichols would have altered the defense preparation for trial. As the prosecutor provided none of these three pieces of evidence, Appellant asserts that he was substantially prejudiced.

In support of his argument, Appellant relies on *Commonwealth v. Green*, 536 Pa. 599, 640 A.2d 1242 (1994). In *Green*, we reversed the defendant's conviction based on a *Brady* violation where the Commonwealth suppressed evidence that the defendant's accomplice confessed to a third-party that she, not the defendant, was the shooter. This third-party informed investigators of the accomplice's confession, but the Commonwealth failed to turn this statement over to the defense. Appellant argues that, like *Green*, the suppressed evidence in this case included a statement by a person providing incriminating information to a disinterested third-party.

The Commonwealth responds that the statements Appellant relies upon are not exculpatory or material, as required to establish a *Brady* violation. Specifically, with regard to the substance of Mr. Beirne's statement, the Commonwealth argues that by providing the defense with the February 10, 1993, police report, it provided all of the substantive information it possessed regarding Mr. York: that a man named Hyde York claimed that Sally Inman committed the murders. It further argues that its failure to turn over to the defense Mr. Beirne's name is of no moment because Mr. Beirne was nothing more than the source of a fruitless lead. The Commonwealth also observes that Appellant presented no evidence that he attempted to locate or investigate Mr. York despite being aware of his belief of Ms. Inman's guilt, and made no effort to interview Ms. Inman. Accordingly, the Commonwealth asserts that Appellant has failed to demonstrate how providing Mr. Beirne's name would have changed the result of the trial.

Turning to the Buonfiglios' statements, the Commonwealth relies on testimony that neither Chief Rinebold nor Corporal Grimes spoke to the Buonfiglios, and therefore made no record of any such conversations. The Commonwealth also argues that there is nothing exculpatory or material about the Buonfiglios' post-trial testimony. Similarly, with respect to Mr. Nichols' statement, the Commonwealth argues that although Mr. Nichols contacted the police, the police never made any record of his statement because the information provided was of no investigative value, and Appellant has failed to demonstrate that the information was either exculpatory or material. *See Agurs*, 427 U.S. at 110–11, 96 S.Ct. 2392 ("The mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

The trial court found that the evidence provided by Mr. Beirne was not material for two reasons: First, Mr. Beirne's testimony about Mr. York's statement was inadmissible hearsay. Because there was no evidence that Mr. York, the declarant, was available to testify, and Appellant did not claim that the information provided by Mr. Beirne would have led to other favorable evidence or impacted his trial strategy, the trial court held that the inadmissibility of the substance of Mr. Beirne's testimony rendered it immaterial. Second, the trial court found that based on the February 10, 1993, police report, Appellant in fact possessed information that Mr. York may have been a beneficial witness. With respect to the Buonfiglios and Mr. Nichols, the trial court found that Appellant had failed to establish a *Brady* violation because he "does not claim nor has he proven that the evidence from [Mr.] Nichols and the Buonflglios was within the possession or knowledge of the Commonwealth." Trial Ct. Opinion, May 2, 1995, at 8.[8]

8. The trial court relied on cases that have since been overruled which provided that district attorneys were not required to provide the defense with evidence that they did not possess and of which they were unaware that was exclusively within police custody. *See, i.e., Commonwealth v. Bonacurso*, 500 Pa. 247, 455 A.2d 1175, 1177 n. 3 (1983). Notably, these decisions were in force at the time of the pre-trial in this

█ First addressing Appellant's *Brady* claim premised on the post-trial testimony of Mr. Beirne, we will assume for purposes of our discussion the truth of Mr. Beirne's testimony that he heard from Mr. York that Mr. York heard Sally Inman confess to the murders, and that he provided this information to the District Attorney's Office. The primary basis for the trial court's holding that the information provided by Mr. Beirne was not material was its finding that it was inadmissible hearsay and the defense did not claim that the information would have led to other potentially helpful evidence or caused Appellant to alter his trial strategy. *See* Trial Court Opinion, May 2, 1995 at 5 (citing *Green*, 640 A.2d 1242).[9] We have held that inadmissible evidence may be considered material for *Brady* purposes only when the Commonwealth's failure to disclose the evidence adversely affected the preparation or presentation of the defense at trial such that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Green*, 640 A.2d at 1245 ("In determining the materiality of the omitted evidence we must, therefore, consider any adverse effect that the prosecutor's failure to disclose might have had on not only the presentation of the defense at trial, but the preparation of the defense as well.").[10] To meet this burden, Appellant must identify specific evidence or information that would have been uncovered, and explain how that evidence or information would have changed the preparation

case. In *Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136 (2001), we applied the U.S. Supreme Court's later decision in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), to hold that the prosecution's duty when faced with a *Brady* request extends to exculpatory evidence in the files of police agencies of the same government prosecuting the case. *See Commonwealth v. Lesko*, 15 A.3d 345, 370 (Pa.2011).

9. Although Appellant does not claim that Mr. Beirne's statement or post-trial testimony was admissible as a hearsay exception in connection with his *Brady* claim, we acknowledge that he argues its admissibility in connection with the next issue premised on after-discovered evidence.

10. We recognize that the propriety of *Green* is currently pending before this Court in *Commonwealth v. Willis*, J–86–2009. As there is no suggestion here that *Green* is not valid, we assume its validity for this opinion.

and presentation of the defense at trial, and, consequently, the result of the proceeding. *See id.*

Appellant, however, has not done so. Rather, he merely asserts, without elaboration, that knowledge of Mr. York's statement, as reported by Mr. Beirne, would have "opened up other avenues of investigation for the defense." Appellant's 2011 Brief at 38–39. The truth of this assertion is not apparent. Appellant already knew that Mr. York was a potentially beneficial witness because the February 10, 1993, police report included a statement by Sally Inman that Mr. York believed she was guilty of the murders. With this knowledge, Appellant was free to pursue an investigation of Mr. York and the basis of his belief of Ms. Inman's guilt. We cannot agree with Appellant that if the Commonwealth had provided Mr. Beirne's statement about Mr. York's belief, the result of the trial would have been different. *See Kyles,* 514 U.S. at 434, 115 S.Ct. 1555 ("evidence is material under *Brady,* and the failure to disclose it justifies setting aside a conviction, only where there exists a reasonable probability that, had the evidence been disclosed, the result at trial would have been different.").

Moreover, the fact that Appellant already had information regarding Mr. York's belief in Ms. Inman's guilt undermines his assertion that the Commonwealth suppressed the information provided by Mr. Beirne. *See Commonwealth v. Natividad,* 595 Pa. 188, 938 A.2d 310, 331 (2007) ("It is well-settled that the Commonwealth is not obligated to provide evidence that is readily obtainable by the defendant."); *Commonwealth v. Wallace,* 555 Pa. 397, 724 A.2d 916, 923 n. 7 (1999) (finding no *Brady* violation for the Commonwealth's failure to disclose evidence relating to a police officer's testimony in another proceeding where trial counsel knew of the officer and his testimony prior to trial); *Commonwealth v. Mulholland,* 549 Pa. 634, 702 A.2d 1027, 1033 (1997) (finding no *Brady* violation where the withheld statement was duplicative of other evidence in possession of defense); *Commonwealth v. Lambert,* 584 Pa. 461, 884 A.2d 848, 856 (2005) (rejecting an appellant's *Brady* claim that the Commonwealth failed to disclose evi-

dence that was duplicative of evidence the appellant received in discovery); *Commonwealth v. Morris*, 573 Pa. 157, 822 A.2d 684, 696 (2003) (no *Brady* violation occurs where appellant knew or could have uncovered evidence with reasonable diligence). Appellant's failure to specify which avenues of investigation Mr. Beirne's statement would have opened for the defense or how these avenues of investigation would have changed the result of trial, together with Appellant's possession of the February 10, 1993, police report, distinguish this case from *Green*.

We address jointly Appellant's remaining *Brady* claims regarding the testimony of the Buonfiglios and Mr. Nichols. As noted above, in January 1990 the Buonfiglios heard Sally Inman tell the victim Greg Inman that she wanted to kill him, and, two months before the murders, Greg Inman told them he feared Sally Inman. Mr. Nichols believed that he observed a black mustang, driven by an unknown driver, rev its engine to threaten Greg Inman. Considering this evidence on the context of the trial, *see Small*, 741 A.2d at 675–76 (directing that a *Brady* analysis includes an evaluation of the context of the entire record), we do not believe that if this evidence had been disclosed there is a reasonable probability that the result of the trial would have been different. *See Kyles*, 514 U.S. 419, 115 S.Ct. 1555; *McGill*, 832 A.2d at 1019. Appellant's defense was premised on testimony that Sally Inman hated the two victims, had the means, motive, and opportunity to kill them, had made threats to Greg Inman in the past, and rejoiced at their deaths. The defense presented numerous witnesses who testified that they heard Sally Inman threaten Greg Inman and relied on these witnesses in closing.[11] The jury heard this overwhelming evidence of animosi-

11. *See* N.T. May 11, 1994, Vol. XXIII, at 13 ("I brought in ten people that talked about threats made by [Sally Inman] ..."); *id.* at 15 (referring to the many witnesses who testified that they heard Sally Inman say "I'm gonna kill them, I'm gonna get even, I'm gonna blow his genitalia off ... I'm gonna hire a hit-man. I'm gonna do it and get away with it."); *id.* ("And those threats that we presented, made by Sally Inman, were uncontradicted."); *id.* at 16 (discussing the nature of Ms. Inman's threats and motive); *id.* at 50 ("... you've heard all the people that said it. I'm gonna kill him, I'm gonna do it. I'm gonna

ty by Sally Inman toward the victims, yet they convicted Appellant. We do not believe that, assuming *arguendo* that the government suppressed the evidence presented by the Buonfiglios and Mr. Nichols, its provision to the defense would have altered the result of the trial. Therefore, the defense's alleged lack of knowledge of this evidence does not undermine this Court's confidence in the outcome of the trial. *See Dennis*, 17 A.3d at 308 (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375). Although the evidence from the Buonfiglios and Mr. Nichols might have been helpful to the defense, it is not material or exculpatory. *See Lambert*, 884 A.2d 848, 856 (Pa.2005) (*Brady* does not require the disclosure of information that is not exculpatory but might merely form the groundwork for possible arguments or defenses); *Commonwealth v. Chambers*, 570 Pa. 3, 807 A.2d 872, 887 (2002); *Paddy*, 15 A.3d at 451; *Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395, 406 (1994); *Commonwealth v. Gee*, 467 Pa. 123, 354 A.2d 875, 878 (1976) (exculpatory evidence is that which "extrinsically tends to establish defendant's innocence of the crimes charged . . .") *overruled on other grounds by Commonwealth v. Brady*, 510 Pa. 123, 507 A.2d 66 (1986). Accordingly, Appellant is not entitled to relief as a result of the post-trial information provided by Mr. Beirne, the Buonfiglios, or Mr. Nichols.

## VII. After–Discovered Evidence

▉ Appellant next claims he is entitled to a new trial on the basis of after-discovered evidence. After-discovered evidence is the basis for a new trial when it: 1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of trial by the exercise of reasonable

blow his balls off, and I will get away with it."); *id.* at 51 ("I brought in ten witnesses to talk about [Sally Inman's] motive, talk about [her access to] a gun."); *id.* at 54 ("A whole range of people came in and testified about threats that Sally Inman made. Ten witnesses, in all, they relayed the portrait of a hateful, vengeful angry woman, because Sherri Chamberlain had taken, her best friend, had taken her husband and her home. How many times have you heard that [?]"); *id.* at 55 (detailing evidence of Sally Inman's threats, motive, and access to guns as testified to by witnesses Evelyn Collins, Roseanne Stringham, Helen Blow, Dorothy Soule, Denise Totoritis, Stanley Douglas Benne, Jr., Richard Janowsky, Stephanie Chamberlain, and Susan Burnett).

diligence; 2) is not merely corroborative or cumulative; 3) will not be used solely for impeaching the credibility of a witness; and 4) is of such nature and character that a new verdict will likely result if a new trial is granted. *Commonwealth v. Boyle*, 533 Pa. 360, 625 A.2d 616, 622 (1993); *Commonwealth v. Smith*, 518 Pa. 15, 540 A.2d 246 (1988). Further, the proposed new evidence must be "producible and admissible." *Smith*, 540 A.2d 246, 263 (Pa.1988); *Commonwealth v. Scott*, 503 Pa. 624, 470 A.2d 91, 93 (1983).

Appellant relies on all of the evidence presented in support of his *Brady* claims (from Mr. Beirne, the Buonfiglios, and Mr. Nichols) to also support the claim of after-discovered evidence. Additionally, Appellant presented the testimony of Dixie Womer, an acquaintance of Sally Inman. Appellant relies on the following six admissible assertions contained in Mrs. Womer's testimony: [12] Ms. Inman knew the whereabouts of guns in the Womer home and expressed an interest in them; Ms. Inman had access to these guns; Ms. Inman claimed to have been stalking the victims; Ms. Inman claimed that Sherri was "running around" with an EMS driver named Terry; Ms. Inman retrieved a blood-stained carpet from the victims'

12. Appellant also relies on several other assertions contained in Mrs. Womer's testimony to support his after-discovered evidence claim which the trial court deemed inadmissible: that Sally Inman said the victims would be dead "if not for somebody putting her away in a nut house"; that Ms. Inman stated that the victims "were going to be dead meat" and that she wanted to "blow their brains out;" that Ms. Inman lied to the grand jury in order to keep the focus of the investigation on Appellant when she testified that Appellant expressed an intention to shoot his wife; that Ms. Inman claimed to have sent $10,000 to her son Tosh Inman so Tosh Inman would make a phone call to her that would convince authorities that she was home when she actually was not; and that Mrs. Womer told Ms. Inman that Mr. Womer was going to report two guns stolen from his gun cabinet, a .357 magnum and a .38 caliber, to which Ms. Inman responded that she hoped she would not be blamed.

As questions concerning the admissibility of evidence are committed to the sound discretion of the trial judge, whose rulings will not be disturbed on appeal absent an abuse of that discretion, and Appellant has not demonstrated that the trial court abused its discretion in this regard, we will only consider the evidence the trial court deemed properly admissible. *See Commonwealth v. Reed*, 605 Pa. 431, 990 A.2d 1158, 1167 (2010); *Commonwealth v. Kennedy*, 598 Pa. 621, 959 A.2d 916, 923 (2008).

residence and claimed that she was going to hang it on her wall "to brighten her day"; and following Appellant's conviction, Ms. Inman gleefully exclaimed that she was free and could live her life again.

Applying the four-pronged test of *Boyle* to Mrs. Womer's testimony, Appellant argues that a new trial is warranted. With respect to the first prong, Appellant argues that he could not have obtained Mrs. Womer's testimony prior to the conclusion of trial by the exercise of reasonable diligence because the Commonwealth did not interview Mrs. Womer until after trial. Appellant asserts that this fact indicates that the defense "could not possibly have been expected to have obtained the statement" on its own. Appellant's 1997 Brief at 78. With respect to the second prong, Appellant argues that Mrs. Womer's testimony is neither corroborative nor cumulative of other trial evidence because she offered new information that Ms. Inman had access to guns and planned to carry out the murders. Regarding the third prong, Appellant argues that Mrs. Womer's testimony was not useful solely to impeach the credibility of witnesses. Finally, with respect to the fourth prong, Appellant argues that the nature and character of the evidence presented by Mrs. Womer is such that a different verdict will result if a new trial is granted. Appellant also argues that the evidence provided by Mr. Beirne, the Buonfiglios, and Mr. Nichols, discussed *infra* in connection with the previous issue, all entitle him to a new trial as after-discovered evidence.

Regarding Mr. Beirne, the Buonfiglios, and Mr. Nichols, the Commonwealth argues that none of these individuals provided after-discovered evidence entitling Appellant to a new trial because the information they provided was inadmissible hearsay, could have been obtained prior to trial, was cumulative of Appellant's theory at trial, and would not compel a contrary result at a new trial.

The Commonwealth also refutes Appellant's entitlement to relief premised on Mrs. Womer's testimony by highlighting her testimony that Ms. Inman told her that she (Ms. Inman) was on the phone for two hours at the time of the murders,

that Ms. Inman never made any statement of admission to her, and that Ms. Inman stated that she hoped that whoever committed the murders would get away with it. The Commonwealth also argues that Mrs. Womer's testimony is highly suspect because it contradicts information provided by Mrs. Womer in a previous police interview. In this interview, Mrs. Womer told police that there were no handguns missing from her residence and she had no information pertaining to the murders. The Commonwealth further argues that most of Mrs. Womer's testimony was based on inadmissible hearsay. Considering the evidence provided by Mrs. Womer, the Commonwealth argues that it fails to meet the requisite elements of after-discovered evidence.

Considering the admissible after-discovered evidence upon which Appellant relied, the trial court held that it did not warrant a new trial because the defense failed to establish that the evidence could not have been discovered by the exercise of reasonable diligence, the evidence was merely cumulative or corroborative, and the nature and character of the evidence was not such as would likely result in a different verdict.

Unless there has been a clear abuse of discretion, an appellate court will not disturb the trial court's denial of an appellant's motion for a new trial based on after-discovered evidence. *Commonwealth v. Small*, 559 Pa. 423, 741 A.2d 666, 673 (1999); *Commonwealth v. Parker*, 494 Pa. 196, 431 A.2d 216, 218 (1981). In order for after-discovered evidence to be exculpatory, it must be material to a determination of guilt or innocence. *Small*, 741 A.2d at 673.

With respect to the after-discovered evidence presented by Mr. Beirne, the Buonfiglios, and Mr. Nichols, we conclude that Appellant is not entitled to a new trial for the reasons stated *infra* in our disposal of Appellant's *Brady* claims. Additionally, we agree with the trial court that the admissible evidence offered by Mrs. Womer does not entitle Appellant to relief because it is not of such nature and character that a different verdict would likely result if a new trial is granted. *See Boyle*, 625 A.2d 616. Considering the

new evidence offered by Mrs. Womer in the context of the Commonwealth's evidence against Appellant and the evidence Appellant presented in defense, Appellant's after-discovered evidence claim is ultimately defeated by Mrs. Ulrich's testimony about the telephone call she received in which Sherri named her attacker. As explained *infra* in connection with Appellant's weight and sufficiency challenges, Mrs. Ulrich was powerful evidence against Appellant: the *sine qua non* of the proof of Appellant's guilt. See Trial Ct. Opinion, May 2, 1995, at 21. Notwithstanding the unfortunate and disturbing loss of the redial function, Mrs. Ulrich's testimony was believed by the jury. None of the after-discovered evidence offered by Appellant diminishes the credibility of this witness. Therefore, we conclude that introduction of this evidence would not likely result in a different verdict if a new trial were granted and hence Appellant is not entitled to relief.

Moreover, the after-discovered evidence presented by Mrs. Womer demonstrated that Ms. Inman "obsessively despised Sherri Chamberlain and Greg Inman, that their deaths would and did please her, and that [Ms. Inman] had access to firearms." Trial Ct. Opinion, May 2, 1995, at 21. As the trial court observed, Appellant presented each of these propositions to the jury via numerous witnesses without challenge by the Commonwealth. The new evidence presented is largely cumulative and corroborative of the evidence presented at trial, and therefore does not entitled Appellant to relief as after-discovered evidence.

## VIII. Vindictive Prosecution

 Appellant next argues that the criminal information should have been dismissed because it resulted from vindictive prosecution. As support of this assertion of vindictiveness, Appellant argues that the first two criminal complaints against him were dismissed by the district justice following preliminary hearings, and that each time the criminal complaint was refiled, new charges were added: the first complaint charged two counts of homicide; the second complaint charged the additional offenses of burglary and criminal trespass; and the

third complaint added a new charge of possessing instruments of crime. Appellant relies upon *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), and *Commonwealth v. Rocco*, 375 Pa.Super. 330, 544 A.2d 496 (1988), for the proposition that the filing of additional charges raises the presumption of vindictiveness in retaliation for a defendant's exercise of his right to move for dismissal of the original charges.

The Commonwealth responds factually that the second and third criminal complaints against Appellant contained no new charges. Legally, the Commonwealth argues both *Pearce* and *Blackledge* safeguard an appellant's right to appeal a criminal conviction by providing that a state may not retaliate by imposing a harsher sentence or pursuing a more serious charge, but these cases do not apply here because Appellant was charged with the same conduct in each of three criminal complaints. Moreover, the Commonwealth asserts that Appellant has failed to establish any facts supporting his assertion of vindictiveness by the prosecution.

The trial court agreed with the Commonwealth and held Appellant's argument failed because the second and third complaints against him contained no new charges. Because the conduct charged did not differ with each complaint, the trial court held that no presumption of vindictiveness arose.

Preliminarily, we observe that Appellant's claim of vindictive prosecution is belied by the role of the investigating grand jury in this case. After having the criminal complaint against Appellant twice thrown out following preliminary hearings, the prosecuting authorities turned over to the grand jury the responsibility to determine whether to charge Appellant and if so, with which crimes. The grand jury heard from sworn witnesses and returned a presentment finding reasonable grounds to believe Appellant committed five criminal violations (two homicides, burglary, criminal trespass, and possessing instruments of crime). *See In re Fourth Dauphin County Investigating Grand Jury*, 596 Pa. 546, 946 A.2d 666, 668 (2008) ("A presentment is a recommendation by a Grand Jury

that charges be brought. It is a summary of what the Grand Jury heard during its tenure and what it concludes should happen with the information it assembled."). The trial court accepted the presentment, as did the prosecuting authorities who followed the grand jury's direction and charged Appellant as recommended. The role of the grand jury indicates the prosecutor's charging decision was not the result of vindictiveness but of the grand jury's opinion that there were reasonable grounds to believe Appellant committed five criminal violations.

 Moreover, we discern no error in the Commonwealth's criminal complaint or criminal information. A criminal complaint must contain "a summary of the facts sufficient to advise the defendant of the nature of the offense charged...." Pa.R.Crim.P. 504(6)(a). Additionally, "neither the evidence nor the statute allegedly violated need be cited in the complaint." *Id.* Here, each of the three complaints against Appellant charged him with the same conduct: Appellant forcibly broke into the home shared by the victims and murdered them by inflicting multiple gunshot wounds. Consequently, it was unnecessary for the prosecution to identify the criminal violations Appellant's acts constituted, and to the extent it did so, it was gratuitous. It is not until the information is filed that the Commonwealth is required to provide citations to the statutes and sections that the defendant is alleged to have violated. Pa.R.Crim.P. 560(C) ("The information shall contain the official or customary citation of the statute and section thereof, or other provision of law that the defendant is alleged therein to have violated; but the omission of or error in such citation shall not affect the validity or sufficiency of the information.").

Finally, the cases upon which Appellant relies do not compel a different result. *Pearce* concerned prisoners who successfully attacked their convictions for assault and burglary and received substantially longer sentences upon reconviction for the same offense, and the Court held that the imposition of the longer sentence in retaliation for a defendant's successful attack on his first conviction would be an unconstitutional

deterrent to the exercise of appellate rights. 395 U.S. 711, 89 S.Ct. 2072. In *Blackledge*, a prosecutor brought a greater charge when the defendant, after conviction, exercised his state statutory right to a trial *de novo* in a higher court. 417 U.S. 21, 94 S.Ct. 2098. The Court held that prosecutorial vindictiveness in bringing a greater charge to deter a challenge to the original conviction was similarly offensive. *Id.* In *Rocco*, after the defendant was granted a disposition of probation without verdict, the prosecution filed new charges which alleged different criminal conduct arising from the same facts. The Superior Court held that the prosecution's conduct gave rise to a presumption of vindictiveness which the Commonwealth was required to rebut.

Appellant seeks to advance his claim by equating it with the prosecutorial vindictiveness addressed in *Pearce*, *Blackledge*, and *Rocco*. Each of these three cases, however, involved new charges following the defendant's exercise of post-trial rights. In contrast, Appellant is attempting to formulate a new basis for an allegation of prosecutorial vindictiveness arising from the prosecutor's pre-trial charging decisions following the dismissal of a complaint at a preliminary hearing. As the Supreme Court has cautioned, however, there is "good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pre-trial setting." *United States v. Goodwin*, 457 U.S. 368, 381, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982).[13] A pre-trial charging

13. The *Goodwin* court explained as follows:

In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized. In contrast, once a trial begins-and certainly by the time a conviction has been obtained-it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.

decision is less likely to be improperly motivated than a decision made after trial. *Id.* Consequently, we cannot agree with Appellant that the circumstances presented here could give rise to a presumption of vindictiveness.

Because Appellant's novel position is unsupported, and because it neglects to consider the respective requirements of a criminal complaint and a criminal information, we conclude that Appellant's claim of prosecutorial vindictiveness warrants no relief.

### IX. Admissibility of Mr. Janowsky's Testimony

■ Appellant's next issue challenges the trial court's decision to allow the testimony of Commonwealth witness Mr. Janowsky. As discussed above, Mr. Janowsky testified that he had an unnamed acquaintance who purportedly was willing and able to use violence or intimidation to facilitate marital reconciliations. Mr. Janowsky testified that Appellant repeatedly asked him to contact this acquaintance. Appellant argues that Mr. Janowsky's testimony was inadmissible because it was irrelevant, prejudicial, and hearsay. He claims that the conversations between Appellant and Mr. Janowsky were too remote because they occurred approximately eighteen months before the murders.

The Commonwealth responds that the trial court did not abuse its discretion in admitting this testimony because it was relevant to Appellant's motive, design, planning, ill will, and malice. *See Commonwealth v. Glover*, 446 Pa. 492, 286 A.2d 349, 351 (1972) ("It is well settled that evidence to show motive, or intent, or plan, or design, or ill will or malice is

In addition, a defendant before trial is expected to invoke procedural rights that inevitably impose some "burden" on the prosecutor. Defense counsel routinely file pretrial motions to suppress evidence; to challenge the sufficiency and form of an indictment; to plead an affirmative defense; to request psychiatric services; to obtain access to government files; to be tried by jury. It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter. The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates.
457 U.S. at 381.

always admissible."). The Commonwealth further argues that the remoteness in time of the evidence goes to the weight of the evidence and not its admissibility. *See Commonwealth v. Zdrale*, 397 Pa.Super. 167, 579 A.2d 1309, 1314 (1990), *rev'd on other grounds*, 530 Pa. 313, 608 A.2d 1037 (1992). Finally, the Commonwealth responds that Mr. Janowsky's testimony was not hearsay because it was not offered to prove the truth of the matter asserted; rather, it was admitted to demonstrate what Mr. Janowsky told Appellant, to explain the significance of Appellant's requests that Mr. Janowsky introduce Appellant to the acquaintance.

The trial court defended its decision to admit this testimony by characterizing it as relevant and highly probative, because Appellant's attempts to solicit strong-arm assistance occurred while the victims were living together and while the divorce action between Appellant and Sherri was pending.

The admissibility of evidence is within the sound discretion of the trial court, wherein lies the duty to balance the evidentiary value of each piece of evidence against the dangers of unfair prejudice, inflaming the passions of the jury, or confusing the jury. *Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 623 (2010); *Commonwealth v. Dillon*, 592 Pa. 351, 925 A.2d 131, 141 (2007). We will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. *Flor*, 998 A.2d at 623; *Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403, 416 (2003).

We discern no abuse of discretion with regard to the trial court's decision to permit Mr. Janowsky's testimony. First, the evidence was relevant because, as the Commonwealth argues, it tended to show Appellant's motive, design, plan, ill will, and malice. *Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 42 (2008) ("Evidence to prove motive, intent, plan, design, ill will, or malice is always relevant in criminal cases."); *Glover*, 286 A.2d at 351. Second, the trial court acted within its discretion in determining that under the facts of this case, the conversations were not too remote where they occurred

eighteen months before the murders while the victims were living together and the divorce action was pending. *See Commonwealth v. Drumheller*, 570 Pa. 117, 808 A.2d 893, 905–06 (2002) (approving admission of evidence of four protection from abuse petitions filed by a homicide victim against the defendant in the thirty-four months preceding the victim's murder); *Commonwealth v. Ulatoski*, 472 Pa. 53, 371 A.2d 186, 192 (1977) (finding no abuse of discretion in the admission of evidence of bruising on a homicide victim—who was the defendant's wife—occurring as much as seventeen months before her death, particularly as the evidence indicated a pattern of physical abuse). Moreover, we have held that "[a]lthough evidence of (prior occurrences) which is too remote is not properly admissible . . . it is generally true that remoteness of the prior instances of hostility and strained relations affects the weight of that evidence and not its admissibility." *Drumheller*, 808 A.2d 893, 905 (Pa.2002) (citing *Commonwealth v. Petrakovich*, 459 Pa. 511, 329 A.2d 844, 850 (1974)). Third, we agree with the Commonwealth that Mr. Janowsky's statements were not hearsay because they were admitted not to prove the truth of the matters asserted but to demonstrate the significance of Appellant's requests to meet Mr. Janowsky's acquaintance. Finally, the trial court instructed the jury to consider Mr. Janowsky's testimony to "understand the context and understand the information that was provided by this witness to the defendant . . . I'm admitting it for that limited purpose." N.T. Vol. XIII at 166–67. Therefore, we hold that the trial court did not abuse its discretion in admitting evidence offered by Mr. Janowsky.

## X. Prosecutorial Misconduct

Appellant alleges four instances of prosecutorial misconduct which he claims should have resulted in a mistrial. A mistrial is required only where the nature of the event is such that its unavoidable effect is to deprive the defendant of a fair trial. *Commonwealth v. Montgomery*, 533 Pa. 491, 626 A.2d 109 (1993). He alleges that these four instances separately and together deprived him of a fair trial by biasing and inflaming the jury. First, Officer Ogden testified that upon

learning that Appellant was thought to be the perpetrator, he quickly went to Appellant's house because he believed Appellant had four children in his custody. N.T. May 5, 1994, Vol. XVI, at 75. The trial court instructed the jury to consider this testimony as an explanation for why the officer acted so quickly, but not for the truth of that explanation, *id.*, and further denied a motion for mistrial because it discerned no prejudice to Appellant. Appellant asserts that this testimony created the unsupported impression Appellant was a threat to his children.

The second instance occurred during the testimony of Mr. Janowsky, who testified that he had an acquaintance who may have been willing to provide strong-arm assistance to Appellant's marriage problems, and whom Appellant had expressed an interest in meeting. While Mr. Janowsky was testifying, the prosecutor asked him why he declined to talk to his acquaintance on behalf of Appellant. Mr. Janowsky responded that he felt that "there was going to be more done than somebody going to talk to somebody." N.T. May 3, 1994, Vol. XIII, at 171. The trial court sustained Appellant's objection and instructed the jury that it must disregard evidence to which the trial court sustained an objection. Appellant argues that this question ascribed to Appellant a sinister and violent motive which was unsupported by Mr. Janowsky's earlier testimony.

Third, during defense witness Dorothy Soule's testimony, the prosecutor asked her if she recalled that Ms. Inman had previously told her that she (Ms. Inman) thought she knew where Appellant put the gun. The witness answered in the negative, directly refuting that any such conversation had occurred. Appellant claims that the basis of this question was a statement by Ms. Soule that Greg Inman's ex-wife, Sally Inman, told her that "if she got arrested, she knew where the gun is." N.T. May 9, 1994, Vol. XX, at 236. Appellant claims this knowledge was the result of Ms. Inman's guilt. The prosecutor's question, however, indicated that Ms. Inman knew where Appellant hid the gun, an inference Appellant characterizes as unsupported by the evidence as there was

nothing to indicate Appellant knew where the murder weapon was. *Id.* at 237. Following Appellant's objection and request for a mistrial, the prosecutor explained that he had a good faith basis for the question: "it's a question that's based upon knowledge that has come to me. That is, I spoke to [Ms. Inman] . . . and I asked her that specific question. And [Ms. Inman] told me in . . . in . . . in these words, in the presence of a witness, that she never said anything about where the gun was, but that she thought that [Appellant] put the gun in a vat or something like that at his workplace." *Id.* at 238. The trial court denied the motion for mistrial because, by denying that the conversation occurred, the witness had refuted the suggestions, the prosecutor had a good faith basis for the question, and the question was appropriate cross-examination.

Fourth, during the cross-examination of defense witness Galen Trank, the prosecutor asked whether Appellant had ever expressed remorse for the killings. N.T. May 9, 1994, Vol. XIX, at 45. The trial court sustained Appellant's objection to the question. Appellant characterizes this question as argumentative because it assumed disputed facts. Appellant claims that considering these four instances in the context of the entire case, particularly the weakness of the Commonwealth's evidence, they created a fixed bias and hostility to Appellant that warranted a mistrial.

The Commonwealth argues that these four instances were either not inflammatory or prejudicial (Officer Ogden), did not deprive Appellant of a fair trial (Mr. Janowsky and Mr. Trank), or the prosecutor had a good-faith basis for the conduct (Ms. Soule). Moreover, according to the Commonwealth, the trial court's instructions cured any prejudice that could have resulted.

 It is well-settled that the review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. *See Commonwealth v. Wright,* 599 Pa. 270, 961 A.2d 119, 142 (2008); *Commonwealth v. Simpson,* 562 Pa. 255, 754 A.2d 1264, 1272 (2000). "An abuse of discretion is not merely an error of

judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will ... discretion is abused." *Wright*, 961 A.2d at 142 (quoting *Christianson v. Ely*, 575 Pa. 647, 838 A.2d 630, 634 (2003) (internal quotations omitted)). A trial court may grant a mistrial only "where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Wright*, 961 A.2d at 142; *Simpson*, 754 A.2d at 1272. A mistrial is not necessary where cautionary instructions are adequate to overcome prejudice. *Commonwealth v. Spotz*, 552 Pa. 499, 716 A.2d 580, 593 (1998); *Commonwealth v. Lawson*, 519 Pa. 175, 546 A.2d 589, 594 (1988).

The trial court was within its discretion in finding that Officer Ogden's testimony was not inflammatory or prejudicial. There was no suggestion by the Commonwealth that the children were ever in danger of being harmed, and, to the contrary, the Commonwealth suggested that one of Appellant's motives was his desire to keep custody of the children. Moreover, the trial court directed the jury not to consider Officer Ogden's statement for its truth but as an explanation of the officer's actions. The trial court, who was in the best position to assess the effect of this allegedly prejudicial statement on the jury, *see Commonwealth v. Simpson*, 562 Pa. 255, 754 A.2d 1264, 1272 (2000), was satisfied that Officer Ogden's testimony presented no basis for a mistrial, and we discern no abuse of discretion in this regard.

With respect to Mr. Janowsky and Mr. Trank, as in the case of Officer Ogden, the trial court sustained Appellant's objections to prosecutor's questions and directed the jury to disregard the evidence. With respect to Ms. Soule, the trial court instructed the jury that questions of counsel are not evidence. In most instances, the law presumes that the jury will follow the instructions of the court. *See Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997, 1016 (2007); *Common-*

*wealth v. Brown,* 567 Pa. 272, 786 A.2d 961, 971 (2001). Appellant here failed to demonstrate that this case falls within any of the narrow exceptions to that rule.

 Considering these four instances individually and collectively, we do not believe that Appellant was prejudiced so that the "unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Rega,* 933 A.2d 997, 1016 (Pa.2007). No relief is warranted.[14]

## XI. Criminal Complaint

Appellant contends that the trial court erred by refusing to dismiss the criminal information because it was based on a fatally defective criminal complaint. According to Appellant, the criminal complaint was fatally defective because it was not supported by a legally sufficient affidavit of probable cause. Second, he claims that it was fatally defective because it failed to set forth all of the essential elements of the crimes charged; specifically, malice (with respect to homicide), and that Appellant broke into a building (with respect to criminal trespass). Finally, Appellant argues that the complaint was unconstitutionally vague because, although it alleged that he acted intentionally, knowingly, recklessly, or negligently, it did not specify which state of mind he possessed.

The Commonwealth argues that the argument premised on the affidavit of probable cause is defeated by *Commonwealth v. Abdul–Salaam,* 544 Pa. 514, 678 A.2d 342 (1996), which held that any issue concerning a defect in the affidavit of probable cause becomes moot upon the district justice's finding at the preliminary hearing that a *prima facie* case has been established. Additionally, the Commonwealth argues that contrary to Appellant's assertion, the criminal complaint set forth all of the requisite elements for each crime.

14. Appellant also argues that the prosecutor engaged in misconduct by improperly attempting to influence two witnesses. Appellant, however, did not raise this issue to the trial court and it is therefore waived. Pa.R.A.P. 302(a).

The trial court held that the complaint was supported by a legally sufficient affidavit of probable cause and there was no merit to Appellant's assertion that the complaint failed to charge all of the requisite elements. Finally, the trial court held that the states of mind charged in the complaint are not mutually exclusive, and the complaint was therefore not un-constitutionally vague, because the Commonwealth charged that Appellant possessed all of those states of mind.

■■■ Turning to the first of Appellant's arguments, regard-ing the validity of the affidavit of probable cause, we agree with the Commonwealth. Upon the district justice's finding at the preliminary hearing that a *prima facie* case had been established, any issue concerning a defect in the affidavit or probable cause became moot. *Abdul–Salaam*, 678 A.2d at 349.

■■■ Concerning the second argument regarding the es-sential elements of the crimes charged, we observe that the criminal complaint and information both alleged, with respect to murder, that Appellant committed the murders by shooting the victims, thereby causing their deaths. Although the com-plaint did not use the term malice, the assertions contained therein adequately implied malice. *See, e.g., Commonwealth v. Carbone*, 524 Pa. 551, 574 A.2d 584 (1990) (there is a presumption that using a weapon on a vital part of the body implies malice); *Commonwealth v. D'Ambro*, 500 Pa. 303, 456 A.2d 140, 143 n. 5 (1983) (same).

Additionally, criminal trespass occurs when, *inter alia,* an individual "breaks into any building or occupied structure or separately secured or occupied portion thereof." 18 Pa.C.S. § 3503. The complaint merely alleged that Appellant "did enter" the victim's home. However, the grand jury's present-ment was incorporated into the affidavit of probable cause supporting the criminal complaint, and alleged in sufficient detail that the shooter gained entry into the victims' home by throwing a typewriter through the door. Appellant's claim that the complaint failed to allege that he broke into a building is therefore without merit.

■ Finally, with respect to Appellant's contention that the criminal complaint was unconstitutionally vague, Appellant has not developed his claim or cited to relevant authority as support. There is no unconstitutionally impermissible vagueness in charging, simultaneously, that Appellant acted intentionally, knowingly, recklessly, or negligently. As the trial court noted, the Commonwealth was charging that Appellant possessed all of those states of mind. No relief is warranted.

## XII. Request for Grand Jury Testimony

■ Appellant next claims that the trial court erred by denying his pretrial request to examine the testimony of witnesses who appeared before the grand jury. Appellant claims the trial court should have granted this pretrial request in the interests of justice. The Commonwealth responds that the trial court complied with Rule 230(B)(2) of the Pennsylvania Rules of Criminal Procedure and Appellant does not argue otherwise. The trial court likewise held that it complied with Rule 230(B)(2) when it denied Appellant's pre-trial request.

The relevant portion of Rule 230(B)(2), entitled "Disclosure of Testimony before Investigating Grand Jury," and on which Appellant relies, provides as follows:

> When a witness in a criminal case has previously testified before an investigating grand jury concerning the subject matter of the charges against the defendant, upon application of such defendant the court shall order that the defendant be furnished with a copy of the transcript of such testimony; *however, such testimony may be made available only after the direct testimony of that witness at trial.*

Pa.R.Crim.P. 230(B)(2) (emphasis added).

Here, the trial court complied with the mandates of Rule 230(B)(2) by making the relevant grand jury testimony available after the witness's direct testimony. Appellant has identified no relevant statutory or constitutional basis in support of his argument that he is entitled to the grand jury testimony pretrial. Accordingly, Appellant is entitled to no relief.

## XIII. Constitutionality of Death Sentence

### A. Constitutionality of Section 9711

Appellant argues that the statutory procedure by which capital sentences are imposed, 42 Pa.C.S. § 9711, is unconstitutional because prosecutors are vested with the initial discretion to determine whether to seek a death sentence. He claims that in this case and in every other capital case, the prosecutor abused its discretion to seek the death penalty because that discretion is unfettered and therefore arbitrary. *See Commonwealth v. DeHart*, 512 Pa. 235, 516 A.2d 656 (1986) (finding no basis to hold the death penalty statute unconstitutional "absent some showing that prosecutorial discretion is being abused in the selection of cases in which the death penalty will be sought.").

■■■ We have repeatedly held that the decision to seek the death penalty pursuant to Section 9711 is not the result of the prosecutor's unfettered discretion; rather, the prosecutor may only seek the death penalty if at least one enumerated aggravating circumstance is present. *See Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859, 878 (2000) (holding that prosecutor's decision to seek the death penalty is limited by the confines of Section 9711); *Commonwealth v. Crews*, 552 Pa. 659, 717 A.2d 487 (1998) ("Pennsylvania's death penalty statute appropriately limits the discretion involved in both seeking and imposing the death penalty, setting forth objective criteria in the form of aggravating circumstances that are completely unrelated to the socioeconomic status of the defendant."); *Commonwealth v. Strong*, 522 Pa. 445, 563 A.2d 479, 487–88 (1989) (summarily rejecting a defendant's argument that the death penalty was unconstitutionally "arbitrary and capable of whimsical application because it imposes no limitation upon the exercise of prosecutorial discretion in electing to demand the death penalty in a given case even if aggravating factors are present."); *DeHart*, 516 A.2d at 670 (holding that "[a]bsent some showing that prosecutorial discretion is being abused in the selection of cases in which the death penalty will be sought, there is no basis for appellant's assertions [that the

discretionary nature of the prosecutor's decision to seek the death penalty is unconstitutional]."); *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982) (holding that the current death penalty statute was acceptable under both the federal and the state Constitutions). *See also Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ("Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts."). As the prosecutor's decision to seek the death penalty is limited by the confines of Section 9711, Appellant is entitled to no relief on this claim.

### B. Constitutionality of the Death Penalty in this Case

Appellant advances two arguments that his death sentence is unconstitutional. First, he argues that "the sentence of death was the product of passion, prejudice or any other arbitrary factor," 42 Pa.C.S. § 9711(h)(3)(i), thereby requiring reversal. The arbitrary factor on which Appellant relies is the decision of the prosecutor to seek the death penalty. Second, he argues that "the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)," 42 Pa.C.S. § 9711(h)(3)(ii), thereby requiring reversal. The jury found that the following two aggravating factors outweighed any mitigating factors: "[t]he defendant committed a killing while in the perpetration of a felony" (burglary), 42 Pa.C.S. § 9711(d)(6); and "[t]he defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue," 42 Pa.C.S. § 9711(d)(11). With respect to each aggravating factor, Appellant's argument is the same: that the felony supporting the (d)(6) aggravator (burglary), and the double murder supporting the (d)(11) aggravator, were all part of the same criminal incident, and therefore should not have been submitted to the jury as aggravating factors. He suggests that when burglary is used as an aggravating felony, the burglary should be independent of the murder, rather than in

preparation of the murder. Similarly, because he views the multiple murders as a single criminal incident, Appellant argues that they should not count as aggravation for each other.

██ Section 9711 requires us to vacate the sentence of death if the it was "the product of passion, prejudice, or any other arbitrary factor," or if "the evidence fails to support at least one aggravating circumstance ..." 42 Pa.C.S. § 9711(h)(3)(i), (ii). There is no support for Appellant's argument that the decision of the prosecutor to request the death penalty is the arbitrary factor that renders the sentence reversible under Section 9711(h)(3)(i). If this were the case, the prosecutor's decision to seek the death penalty could actually render the death penalty reversible. This would amount to an absurd result and is untenable.

██ Turning to Appellant's assertion that there was insufficient evidence to support the two aggravating circumstances found by the jury, we have repeatedly held that the commission of a first-degree murder during the perpetration of a burglary may support the finding of the (d)(6) aggravator. See Commonwealth v. Wholaver, 588 Pa. 218, 903 A.2d 1178, 1183 (2006); Commonwealth v. Reid, 571 Pa. 1, 811 A.2d 530, 555 (2002); Commonwealth v. Basemore, 525 Pa. 512, 582 A.2d 861 (1990); Commonwealth v. Henry, 524 Pa. 135, 569 A.2d 929 (1990); Commonwealth v. Thomas, 522 Pa. 256, 561 A.2d 699 (1989). Regarding the (d)(11) aggravating circumstance, we have affirmed the death penalty where multiple murders constituted aggravating circumstances for each other. See Reid, 811 A.2d at 555; Commonwealth v. Saranchak, 544 Pa. 158, 675 A.2d 268 (1996); Commonwealth v. Steele, 522 Pa. 61, 559 A.2d 904 (1989).[15] For these reasons, Appellant's

15. Appellant also argues that his due process rights were violated because the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, see 42 Pa.C.S. § 9711(h)(3)(iii), essentially because he was a devoted father and a conscientious member of the community with no prior arrest record. As Appellant has not supported this assertion with legal authority, we reject this claim outright.

constitutional challenges to the death penalty are devoid of merit.

Because we find no error in appellant's sentences of death for the murders of Sherri Chamberlain and Greg Inman, we must affirm the sentences of death unless we find that they were the product of passion, prejudice or any other arbitrary factor. 42 Pa.C.S. § 9711(h)(3)(i). Having reviewed the trial record, we conclude that the sentences of death were not a product of passion, prejudice, or any other arbitrary factor, but were based upon the evidence. The evidence also was sufficient to support the aggravating circumstances the jury found when it imposed both death sentences. *See* 42 Pa.C.S. § 9711(h)(3)(ii). Accordingly, we affirm the verdicts and the judgments of sentence, including the sentences of death.[16]

Chief Justice CASTILLE, Justices SAYLOR, EAKIN, TODD, McCAFFERY and ORIE MELVIN join this opinion.

**16.** The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).