J-S19007-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| NACOLA DARCEL FRANKLIN | |
| Appellant | No. 599 EDA 2014 |

Appeal from the Judgment of Sentence entered July 16, 2013
In the Court of Common Pleas of Lehigh County
Criminal Division at No: CP-39-CR-0004098-2012

BEFORE:  STABILE, JENKINS, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED JUNE 23, 2015**

Appellant NaCola Darcel Franklin appeals from the judgment of sentence entered in the Court of Common Pleas of Lehigh County ("trial court"), following her jury conviction for first degree murder.  Upon review, we affirm the judgment of sentence.

The trial court summarized the facts of this case as follows:

> Appellant was engaged to marry Billy Brewster.  The wedding was scheduled for 10:00 a.m. on August 11, 2012.  Brewster's cousin, Nakia Kali, and Kali's wife Monique flew in from Chicago to attend the wedding.  The Kalis were staying with Appellant and Brewster the night before the wedding.
>
> In the afternoon of August 10, 2012, the Kalis arrived at Brewster's apartment.  Appellant arrived shortly after the Kalis.  At or around 4:00 p.m., Nakia Kali and Brewster left the apartment to get food from a diner.  When they returned, Appellant was out shopping.  Appellant, Monique Kali, Appellant's mother, and Appellant's niece India went out to a nearby mall to purchase a dress for India.
>
> At approximately 9:00 p.m., Nakia, Monique, and Brewster left the apartment to go to a local strip club.  Nakia testified that

Appellant was frustrated and anxious about the wedding preparations for the following day. At the gentlemen's club, Nakia observed Brewster consume "two drinks and a beer." The three left the club after a few hours, stopped at a restaurant but did not order food because Nakia was suffering from a headache, and returned to the apartment.

Upon returning to the apartment, the Kalis went to a bedroom that was prepared for them. This room was adjacent to the bedroom shared by Appellant and Brewster. Nakia Kali testified he overheard Brewster and Appellant bickering outside their bedroom and could see Brewster through an open doorway. Eventually, Brewster went into his bedroom with Appellant and shut the door. Nakia testified he continued to overhear arguing [sic] between Brewster and Appellant.

Shortly after 2:00 a.m., Appellant called 911 to request help. On the 911 tape, Appellant and Brewster can be clearly heard arguing with one another. Appellant yells [sic] to her son Anthony to get her a knife. At this time, Nakia came out from the bedroom to find out what was transpiring. Nakia observed Brewster standing with his back to the front door and Appellant standing approximately seven or eight feet in front of Brewster holding a knife. On the 911 tape, Appellant repeatedly told Brewster to "give me my baby." She is heard telling Brewster he is "fuckin' drunk." She also admonishes Brewster to "put my baby down," "give me my fuckin' baby," and threatened him by yelling, "You know I'll swing at your dumb ass!" Nakia attempted to diffuse the situation by separating Appellant and Brewster and telling Appellant not to do this. During this argument, India took the baby, BJ, and walked away from the situation. Nakia tried to calm Appellant down as Brewster stood by the door, and he repeatedly asked Appellant to just let him take Brewster out of the apartment. On the 911 tape, Appellant can clearly be heard screaming "Die!" and threatening to stab Nakia. Appellant can also be heard threatening Brewster, saying, "Fucking die tonight. You wanna die tonight?" The initial 911 call ends shortly after that.

Nakia testified that at this time, he yelled at Brewster to get out. Brewster had his hands up with his palms facing outward. Nakia turned his head away from Appellant to push Brewster out the nearby door, and when he looked away, Appellant lunged at Brewster with the knife and stabbed him approximately three times. Nakia grabbed Brewster and took him outside onto the landing for the stairwell. He observed that Brewster was bleeding from his chest in the area of his lung. Once Nakia got Brewster outside, he yelled to India, who was still inside the apartment, to get him a towel. India did not get Nakia a towel to use on Brewster prior to him closing his eyes and becoming nonresponsive.

Back inside the apartment, Monique wrestled Appellant to the ground with Appellant still holding the knife. Monique told

Nakia to take the knife, which Nakia did after prying the knife out of Appellant's hand. Nakia threw the knife to the ground and India picked it up and hid it in the kitchen.

A second 911 call was placed by Appellant within minutes of the first. Appellant advised the dispatcher that her boyfriend just beat her up and stole her baby. She also indicated Appellant needed an ambulance because she cut him for trying to take her baby.

Whitehall Township Police Officer Matthew Reszek was dispatched to Appellant's apartment at approximately 2:19 a.m. The initial dispatch was for a drunk male attacking a female. Before he arrived at the scene, Reszek received updated information which indicated a knife was involved and the female cut the male with the knife. He arrived four minutes later. From the outside looking into the apartment building, Officer Reszek observed what appeared to be feet dangling over the top step of a common stairwell inside the building. He entered the apartment building and called up to Brewster, who was lying on the top landing of the stairwell in the apartment, but Brewster did not respond.

Officer Reszek ascended the stairs and approached Brewster. Reszek observed Brewster's legs moving very slightly. Brewster was lying prone on his face and breathing slightly. Reszek testified Brewster appeared unconscious and was bleeding from a wound on the left side of his body. He contacted the Communications Center while putting on latex gloves from his belt and told the dispatcher to have the responding ambulance expedited.

While Officer Reszek was still putting on his latex gloves, the door to Apartment Number 7 opened and William Brewster, Billy Brewster's minor son, stepped out into the common area. Reszek could hear both adults' and children's voices coming from inside the apartment. Officer Reszek asked William who the person on the ground was and William responded, "That's my dad." William retreated into the apartment and shut the door.

Once other officers arrived on scene, Officer Reszek proceeded inside the apartment. Officer Reszek encountered Nakia Kali, Monique Kali, Appellant, and several minor children. Appellant was seated on the couch inside the apartment with Monique Kali. Officer Reszek observed Appellant was visibly upset. Officer Reszek asked directly about the

location of the knife. India Franklin, Appellant's teen daughter[1] indicated she hid it in the kitchen and took Officer Reszek to the location where she had hidden it in a cabinet underneath the sink. Officer Reszek retrieved the knife and took it into evidence.

An autopsy showed Brewster died of stab wound to the heart. The manner of death was homicide. Dr. Isidore Mihalakis, who performed the autopsy, testified that Brewster's hands had defensive wounds indicative of a struggle. Mihalakis also testified that Brewster had a .13% blood alcohol level at the time of his death.

Trial Court Opinion, 8/25/14, at 1-6. On August 11, 2012, Appellant was charged with criminal homicide. Following a three-day trial, a jury convicted Appellant of first-degree murder on May 23, 2013.[2] On July 16, 2013, the trial court sentenced Appellant to life in prison without the possibility of parole. On July 26, 2013, Appellant filed a post-sentence motion requesting a new trial, arguing, *inter alia*, that the jury's verdict was against the weight of the evidence. On January 10, 2014, the trial court issued an opinion and order, denying Appellant's post-sentence motion. Appellant timely appealed to this Court.

In her lengthy Pa.R.A.P. 1925(b) statement of errors complained of on appeal, Appellant repeated the argument that the jury's verdict was against the weight of the evidence. Specifically, Appellant argued she lacked the

---

[1] Appellant testified India Franklin was her niece who relocated from California to live with her in Whitehall. N.T. Trial, 5/22/13, at 163-64.

[2] The record indicates that prior to trial Appellant rejected a plea offer for third-degree murder, which would have carried a negotiated minimum of sentence of 13 years' imprisonment. **See** N.T. Trial, 5/21/13, at 8. There was no agreement on the maximum sentence. **Id.**

specific intent to kill the victim. The trial court issued a Pa.R.A.P. 1925(a) opinion, concluding that the testimony presented at trial, Appellant's statements to the victim on the 9-1-1 recording and her stabbing the victim multiple times militate against her weight of the evidence argument.

On appeal, Appellant raises only a single issue for our review: "Whether the [t]rial [c]ourt erred when it denied [] Appellant's post-sentence motion for a new trial based on the verdict of First-Degree Murder being contrary to the weight of the evidence." Appellant's Brief at 2.

We review weight-related issues as follows:

> The weight given to trial evidence is a choice for the factfinder. If the factfinder returns a guilty verdict, and if a criminal defendant then files a motion for a new trial on the basis that the verdict was against the weight of the evidence, a trial court is not to grant relief unless the verdict is so contrary to the evidence as to shock one's sense of justice.

> When a trial court denies a weight-of-the-evidence motion, and when an appellant then appeals that ruling to this Court, our review is limited. It is important to understand we do not reach the underlying question of whether the verdict was, in fact, against the weight of the evidence. We do not decide how we would have ruled on the motion and then simply replace our own judgment for that of the trial court. Instead, this Court determines whether the trial court abused its discretion in reaching whatever decision it made on the motion, whether or not that decision is the one we might have made in the first instance.

> Moreover, when evaluating a trial court's ruling, we keep in mind that an abuse of discretion is not merely an error in judgment. Rather, it involves bias, partiality, prejudice, ill-will, manifest unreasonableness or a misapplication of the law. By contrast, a proper exercise of discretion conforms to the law and is based on the facts of record.

*Commonwealth v. Street*, 69 A.3d 628, 633 (Pa. Super. 2013) (internal citation omitted). Because of the above standard, a trial court's decision to grant or deny a new trial based on the weight of the evidence is one of the

- 5 -

least assailable of its rulings. ***Commonwealth v. Antidormi***, 84 A.3d 736, 758 (Pa. Super. 2014), ***appeal denied***, 95 A.3d 275 (Pa. 2014).

> To obtain a conviction of first degree murder, the Commonwealth must prove that a human being was unlawfully killed, that the defendant perpetrated the killing, and that the defendant acted with malice and a specific intent to kill. Section 2502 of the Crimes Code defines murder of the first degree as an "intentional killing," 18 Pa.C.S. § 2502(a), which, in turn, is defined as a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." *Id.* at § 2502(d). It is well-settled that specific intent to kill can be established through circumstantial evidence such as the use of a deadly weapon on a vital part of the victim's body.

***Commonwealth v. Diamond***, 83 A.3d 119, 126 (Pa. 2013) (citation omitted), ***cert. denied***, 135 S.Ct. 145 (2014).

Here, in support of her weight of the evidence argument, Appellant points out that the trial court abused its discretion for two reasons. First, Appellant argues that she stabbed the victim only once on a vital part of his body and that the trial court was wrong in concluding that she had done so twice. ***See*** Appellant's Brief at 17. Second, Appellant argues that the trial court did not consider the entire transcript of the 9-1-1 call and based its decision only on portions of the transcript unfavorable to her. ***See id.***

In reviewing the first part of Appellant's claim, we conclude the trial court did not abuse its discretion. The number of times Appellant used a deadly weapon on a vital part of the victim's body is of no consequence. What is important is that Appellant stabbed the victim with a knife on a vital

part of his body, thereby causing his death.[3]  Here, the jury heard, *inter alia*,

medical testimony, from which it inferred that Appellant had the specific

intent to kill.  ***See Commonwealth v. VanDivner***, 962 A.2d 1170, 1176

(Pa. 2009) (finding that the jury properly could infer specific intent from

Appellant's use of a handgun upon the victim's head), ***cert. denied***,

***VanDivner v. Pennsylvania***, 559 U.S. 1038 (2010); ***Commonwealth v.***

***Chamberlin***, 30 A.3d 381, 394 (Pa. 2011) (citation omitted) (stating,

"[s]pecific intent to kill can be inferred by the use of a deadly weapon upon a

vital part of the body[]"), ***cert. denied***, ***Chamberlin v. Pennsylvania***, 132

S. Ct. 2377 (2012).  Based on the undisputed evidence that Appellant

stabbed the victim with a knife on a vital part of his body, the jury inferred

Appellant had a specific intent to kill.

In reviewing the second part of Appellant's claim, we also do not find

the trial court abused its discretion.  Appellant essentially argues the 9-1-1

---

[3] Dr. Mihalakis testified at trial:

> There are two stab wounds.  The first is just below into the left of the left nipple.  It is an inch and a quarter long, and it perforates the chest wall, enters into the chest, perforates the left upper lobe of the lung, perforates the heart sac, and then perforates the right ventricle and stops after penetrating about three quarters of the thickness of the interventricular septum.
>
>   . . . .
>
> Well, this is very lethal because it goes through a vital portion of the body; one, left lung, and secondly, the heart.

N.T. Trial, 5/22/13, at 95-96.

recording, when reviewed in its entirety, would demonstrate that Appellant did not intend to kill the victim. In support of this contention, Appellant asserts:

> The 9-1-1 tape/transcript must be viewed in its totality and in conjunction with the physical interaction between [Appellant] and [the victim] after [the victim] returns home at 1:30 a.m. [The victim's] assaultive behavior against [Appellant], his forceful taking of the couple's infant child while in an intoxicated rage, and the physical combat or struggle with [Appellant] both in the bedroom and by the front door are supported, in part, by the testimony of Dr. Mihalakis, who opined that "the wounds to the victim were indicative of a struggle . . . more indicative of a hand-to-hand combat of some sort."

Appellant's Brief at 17-18.

Here, the record indicates the jury not only heard the 9-1-1 recording but also received a transcript of the recording for purposes of reading along. *See* N.T. Trial, 5/23/13, at 101-04. Based on its review of the 9-1-1 recording and other evidence presented, the jury was free to resolve any conflict in evidence against Appellant. Indeed, the jury, as a trier of fact, determines the credibility of witnesses and resolves any conflict or inconsistencies in the evidence. *See Commonwealth v. Cruz-Centeno*, 668 A.2d 536, 541 (Pa. Super. 1995).

Given our review of the entire record, we conclude that the trial court did not abuse its discretion in denying Appellant's motion for a new trial. Specifically, as the trial court noted:

> The uncontradicted testimony at trial is that Appellant and [the victim] got into a verbal confrontation which led to Appellant specifically instructing her minor son to "get her a knife," and he obliged. This instruction can be heard on the 911 tapes introduced into evidence. Likewise, Appellant's recorded statements to [the victim] as captured on the 911 tape included,

"I'm gonna fucking kill you," "Yes, I swear I am going to cut you," "Die! Die!," and "Fucking die tonight, gonna die tonight!" All of this evidence taken in conjunction with the fact that Appellant did in fact stab [the victim] twice with the knife to a vital part of [the victim's] body supports the jury's determination that Appellant acted with specific intent to kill.

. . . .

In reviewing Appellant's post-sentence motion, [the trial court] properly considered the totality of the circumstances in determining if the jury's verdict would shock the conscience. Appellant's own words and actions, including obtaining a knife which would become the murder weapon, support a conclusion that she wanted to kill [the victim].

Trial Court Opinion, 8/25/14, at 11, 13. Accordingly, Appellant is entitled to no relief on this claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/23/2015

- 9 -